Larry BOS and Mary Bos, Appellants,

v.

Craig S. SMITH, individually and as next friend of M.W.F.S., a minor, and C.S.S., a minor and J.E.S., a minor, and V.A.S., a minor, Appellees.

NUMBER 13–14–456–CV

Court of Appeals of Texas, Corpus Christi–Edinburg.

March 10, 2016

Supplemental Opinion by Justice Garza March 31, 2016

63 (Davis, J., dissenting); *see also Anderson,* —— S.W.3d at ——, 2015 WL 1570170, at *3 (Davis, J., dissenting).)

Kevin D. Jewell, Chamberlain, Hrdlicka, White, Williams & Martin, Houston, for Appellants.

Brandy Wingate Voss, Law Offices of Brandy Wingate Voss, PLLC, McAllen, for Appellees.

Before Justices Garza, Benavides and Longoria

## OPINION

Opinion by Justice Garza

This appeal involves a suit filed by appellee Craig S. Smith, individually and as next friend of his minor children M.W.F.S., C.S.S., J.E.S., and V.A.S., against appellants Larry and Mary Bos. Following a bench trial, the trial court rendered judgment awarding over $10 million plus interest to Smith in his individual and representative capacities. On appeal, the Boses raise 21 issues challenging the judgment. We affirm in part, reverse and render in part, and reverse and remand in part.

## I. BACKGROUND

### A. Procedural Background

Smith and his ex-wife Trisha Bos–Smith ("Trisha") are the parents of M.W.F.S. and C.S.S. V.A.S. and J.E.S. are Smith's twin daughters from a prior relationship, whom he raised as a single parent. At the time of trial, V.A.S. and J.E.S. were fourteen

years old, M.W.F.S. was eight years old, and C.S.S. was six years old.

The underlying litigation centers on undisputed allegations that Trisha falsely accused Smith on multiple occasions of sexually abusing his children. Smith, individually and on behalf of his children, sued Trisha's adoptive parents, Larry and Mary Bos, alleging in part that they "aggressively promot[ed]" the false abuse allegations, "manufactured evidence of sexual abuse between and among all Plaintiffs," and conspired with Trisha to deprive Smith of his custody rights to M.W.F.S. and C.S.S. Smith's live petition set forth causes of action for negligence,[1] defamation, interference with custody rights under the Texas Family Code, and conspiracy.[2] The Boses moved to designate Trisha as a responsible third party, arguing in part that she was "negligent by fabricating the allegations of sexual abuse against [Smith], among others, by coaching M.W.F.S. to repeat such allegations, and by deceiving [the Boses] and the State authorities regarding such allegations." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.004(a) (West, Westlaw through 2015 R.S.). The trial court granted the motion.[3]

Prior to trial, the trial court granted partial summary judgment dismissing (1) the defamation claims against Mary, (2) the conspiracy claim insofar as it related to a conspiracy to defame Smith, and (3) the negligent undertaking claim insofar as it related to the Boses' duties under a "child

safety plan" promulgated by the Department of Family Protective Services ("DFPS") on October 23, 2008. Trial proceeded on the remaining claims.

## B. Trial Testimony

Evidence adduced at trial established that Smith and Trisha were married in 2004 and had two sons, M.W.F.S., born in 2005, and C.S.S., born in 2007. Smith testified, "It was—we were well into the relationship when a lot of red flags started showing up that were just unexplainable. The deception and lying was very troubling.... The pregnancy with [M.W.F.S.] was really, really wild; and that's when things began rapidly sliding downhill as far as [Trisha's] stability was concerned." The couple began divorce proceedings in 2006.

Following a mediation, Smith and Trisha reached an agreement regarding division of property and custody of the two boys. Under the mediated agreement, until M.W.F.S. turned three years old, Trisha would have primary custody of M.W.F.S. and Smith would have visitation arranged by a parenting coordinator. As soon as M.W.F.S. turned three years old, a standard possession order ("SPO") would become effective under which Smith would be entitled to possession for the first, third, and fifth weekends of every month from 6:00 p.m. Friday to 6:00 p.m. Monday. The same arrangement—visitation arranged through a coordinator until age three and visitation under an SPO thereaf-

---

1. The petition raised claims of negligent undertaking and negligent activities. The petition also asserted in part that the Boses "failed to exercise the care that was required by the negligence and fiduciary duties of care, protection, full disclosure, candor, they had undertaken and accepted and that which would adhere to an adult in actual control of these children under these circumstances."

2. Smith's live petition also named Marlon Bruno as a defendant and asserted claims of fraud, intentional infliction of emotional distress, and conspiracy against him. The eventual judgment was rendered jointly and severally against the Boses and Bruno. Bruno is not a party to this appeal.

3. Trisha did not make an appearance in the trial court and is not a party to this appeal.

ter—would apply to C.S.S. A final decree of divorce incorporating the agreement was signed on April 25, 2007.

Before long, Smith began having difficulty arranging visits with M.W.F.S. Smith's divorce attorney, Michael Lee, stated that there were times when Trisha would not show up with M.W.F.S. at an agreed place and time. According to Lee, Smith "didn't get his visitation as agreed upon." [4] The parenting coordinator, unable to facilitate visitation, requested to withdraw within two months of the divorce decree. According to DFPS records, the coordinator withdrew because Trisha "made her feel uncomfortable" and the coordinator "feared that she would be [Trisha]'s next target and did not want that to happen." Smith testified that he was only permitted to visit his sons on "a few occasions" during the year following the divorce decree.

Larry Bos testified that neither he nor Mary were given a copy of the SPO. However, Smith testified that the Boses knew of the order and knew that Smith was entitled to possession of M.W.F.S. at certain times. Smith stated that he had "discussions for several years" with the Boses regarding his "right to possess and the needs of the boys to be with their daddy." Smith also testified that, prior to the date the SPO was to take effect with respect to M.W.F.S., he had "more than one" face-to-face meeting with the Boses in which he explained that he was having problems arranging access to the boys. According to Smith, the Boses' main concern was "attempting to induce me to reconcile with Trisha."

The SPO was scheduled to become effective as to M.W.F.S. on his third birthday—June 19, 2008. In June and July of 2008, Smith attempted to exercise visitation twice, but Trisha refused, calling the police on one occasion. Trisha's cell phone records show long calls to the Boses before and after Smith's attempts to visit.

Smith was scheduled to have possession of M.W.F.S. on the weekend of October 17 to 19, 2008. Smith testified that, on October 14, he spoke to Mary on the phone and explained that he would pick up the child from Trisha's house as scheduled on Friday, October 17, at 6:00 p.m. When asked whether he "informed [Mary] of the order that was in effect giving you the authority to have visitation on that weekend," Smith replied "Yes." Nevertheless, on Friday at 4:45 p.m., Trisha advised Smith that she would not allow him to have possession of M.W.F.S. that weekend. Smith then went to Trisha's house, armed with a copy of the SPO and a video camera. When he arrived, he learned that Mary had taken M.W.F.S. to a birthday party. Trisha called the police. According to police records, Trisha explained to police "that she had been advised by her lawyer to not allow Smith to have custody of the children due to some sexual abuse allegations made against two sep[a]rate children." [5] Later, according to Smith, Trisha called and "told me that I thought that I had achieved a great victory this evening but in fact I had not and she was going to show me, or something like that."

At around 8:00 the following morning, Saturday, October 18, 2008, Trisha brought M.W.F.S. and C.S.S. to Smith's house unexpectedly. Smith testified that Trisha "was in a thinly veiled rage" and that she said, " 'You think this is the end? This is just the beginning.' " Phone rec-

**4.** Lee testified: "Looking back on it, I should have had some more specific details and language in [the agreement]."

**5.** The parties appear to agree that Trisha was referring to V.A.S. and J.E.S.

ords show that Trisha made a call to Mary before dropping off the children, and a 16–minute call to Mary after she dropped them off. The phone records show that Trisha called 911 after the 16–minute call to Mary.

About two hours later, Trisha and Mary appeared in front of Smith's house with a police officer and a DFPS investigator.[6] The authorities were there to investigate a claim made by Trisha that M.W.F.S. had made an outcry of sexual abuse against Smith's paralegal, Tracy Dent, who was at Smith's house that morning to work. Trisha informed police that she called M.W.F.S. after dropping him off and that M.W.F.S. reported that Dent had touched his penis. Smith, however, explained that he overheard the phone conversation between Trisha and M.W.F.S. and that M.W.F.S. did not make an outcry of abuse; instead, according to Smith, M.W.F.S. told his mother that no one touched him. The police agreed that there was no evidence of abuse and did not arrest Dent. However, DFPS insisted that Smith take M.W.F.S. to Driscoll Children's Hospital for a sexual assault nurse examiner ("SANE") examination. Smith reluctantly did so, and doctors found no evidence of abuse. Smith then learned that Trisha was at the hospital and wanted to see M.W.F.S. Smith asked hospital staff to call 911, and he refused to allow Trisha to see M.W.F.S. But, according to Smith, hospital staff "gave [M.W.F.S.] to Trisha, and then Trisha immediately ran out the back door where the emergency room entrance is and took off running."

Later on October 18, Trisha brought M.W.F.S. and C.S.S. to the Boses' house. According to Mary, Trisha asked her to "keep these children until we have an appointment with [DFPS]." Mary testified that Trisha told her that Trisha "had been advised by a police officer to stay away from the children until they went to [DFPS]" and that Trisha had been ordered to take a polygraph exam. Mary agreed to keep the children until October 23, when she and Larry took the children to a meeting with DFPS.

According to DFPS records, at the meeting on October 23, M.W.F.S. first denied that anyone touched him, then he reported that Smith—not Dent—"touched his penis with a fork," cut his penis, and pulled his ear.[7] DFPS records stated that M.W.F.S. reported that this occurred "over his clothes" and at Smith's house. As a result of the outcry, police and DFPS began investigating whether Smith had sexually abused M.W.F.S. Smith testified that this was a "nightmare" and he was "scared to the point of puking." He stated: "It was the most shocking event—up until that point in my life it was the most shocking event of my life. It was disturbing beyond my limited ability to convey in words the level of my shock and emotion."

At the October 23 meeting, DFPS proposed a "child safety plan" under which the Boses would "supervise contact between Trisha and [M.W.F.S.]" until December 8, 2008. According to Mary, DFPS investigators told her that "either we had to agree to monitor the whole situation or the children would be placed into foster care. And we thought, wow,

6. Smith stated that Trisha had brought "lawn chairs and set them up across the street from my house for [Mary] and Trisha to sit in to watch the proceedings." Mary conceded that Trisha had called her and asked her to meet in front of Smith's house; however, she stated

she did not know why Trisha had asked her to do so.

7. Lee testified that "Trisha apparently told [DFPS] she made a mistake" when she reported that M.W.F.S.'s outcry was actually made against Dent.

that's really bad, you know, because we don't have any experience with foster care, just what we read. And we thought, okay, we'll watch the kids." Lee stated:

> There was a concern that there may be some influence or some coaching. And so to try to get, again, a neutral ingredient into this very delicate, very sensitive, very traumatic situation, Mary and Larry's name came up. And being the grandparents, I agreed with it. I had permission from my client to agree with it under the circumstances that we had to have some involvement. So we did agree.

The day after the child safety plan was put into effect, Trisha's attorney petitioned for a temporary restraining order and sought exclusive custody of the children during the pendency of the investigation.

DFPS met again with Larry and Trisha on October 31, 2008. At this meeting, Larry told investigators that Trisha was "a perfect mother"; that, to his knowledge, Trisha had never been diagnosed with a mental disorder or personality disorder; that Smith "put poisonous thoughts into [DFPS's] head"; that Smith abandoned Trisha for seven months during her pregnancy with C.S.S.; and that Smith was a "nut."

According to DFPS records, Larry also told investigators at the October 31 meeting that Smith "used to abuse the girls," meaning J.E.S. and V.A.S. At trial, Larry denied having made the statement, testifying instead that "as near as I could tell, Mr. Smith was a stand-up guy with the girls." DFPS investigated and questioned J.E.S. and V.A.S. as to whether they had been abused. Both denied that they had been abused.

On examination by Smith's counsel at trial, Larry testified:

> Q. Okay. And did you—do you remember telling [DFPS] that "[M.W.F.S.]

is so clever that he could tell someone if [Trisha] was coaching him into saying something?" In other words, from what I understand from that statement, you were telling them that he was not being coached because he's smart enough to tell you whether he's being coached or not. Do you remember that?

> A. Sir, I don't remember saying that, but I believe that I probably did. However, the reason I said it was not to try to convey that image but simply to try to allay us from this burden of monitoring, which was, a terrible burden for us. We wanted to get off of monitoring so that— and one way to do that is to—you know, if I can convince [DFPS] that there's nothing wrong with Trisha, then I don't have to monitor.

> . . . .

> Q. Okay. Now, [the DFPS record] also says that, "Mr. Bos stated that Mr. Smith will have plenty of time to brainwash [J.E.S.] and [V.A.S.] before I'm able to interview them." Brainwash them of what?

> A. Sir, what I was concerned about was that—I wasn't concerned about brainwashing. I was concerned about being relieved from monitoring. I was told by CPS that there were delays in their investigation because Mr. Smith, bless his heart, was not cooperating with [DFPS] and was slowing down their investigation, which meant that the monitoring was going to go on longer.

> . . . .

> Q. In order to get out of this obligation of monitoring, you felt compelled to tell these people that Craig Smith was going to brainwash two children

and that he was going to going to put poisonous thoughts into CPS?

A.. Well, you can use any words you like, but I was trying very hard to get us out of there. And I thought if they could be pressured a little bit, [DFPS] that is—my anger was not with Mr. Smith. He's doing just what I would expect a good father to do. My anger was with CPS for putting us on the monitoring in the first place.

Larry had previously testified at a deposition that "[w]hen I have taken [M.W.F.S.] to school at times he out of the blue would say, 'Mr. Craig touched my penis' or 'Mr. Craig hurt my penis' or some combination of that, perhaps, something like that." When asked "as the grandparent of a child who is being molested by his father, did you do anything to have that matter investigated or corrected," Larry replied, "Sir, I felt that it was being investigated because I knew we were going to go out and talk to [DFPS]."

After a full investigation, DFPS determined that there was no evidence to support any allegations that Dent sexually abused M.W.F.S. However, DFPS was initially "unable to determine" whether Smith sexually abused M.W.F.S. The records note that Smith "denies it, however it is unable to be proven that [Trisha] told [M.W.F.S.] what to say during the interview." Over the next few months, Smith pressured DFPS to change its disposition to "ruled out." In March 2009, DFPS changed its ruling from "unable to determine" to "ruled out." [8]

The child safety plan was set to expire on December 8, 2008. DFPS records show that, on December 4, 2008, Trisha again contacted DFPS to report that Smith physically and sexually abused M.W.F.S. DFPS closed the case at intake, determining that the allegations were duplicative of the ones made before.

The Boses' monitoring responsibilities ended with the expiration of the child safety plan in December of 2008. Around that time, Trisha met and began living with Marlon Bruno, Ph.D., a former DFPS contractor. According to Lee, less than two months after Bruno met the children, Bruno began representing himself as the father of M.W.F.S. and C.S.S. Lee stated that, when Bruno "got into the picture," "the type of pattern in relation to non-visitation changed drastically." Trisha denied visitation to Smith in December of 2008, and throughout 2009, Trisha and Bruno made several additional allegations of abuse. On March 9, 2009, less than a week after the allegations against Smith had been ruled out by DFPS, Trisha reported to DFPS that Smith and J.E.S. sexually abused M.W.F.S. and C.S.S. On May 26, 2009, Trisha again reported to DFPS that J.E.S. sexually abused M.W.F.S., and Smith's daughters were interviewed again.

Lee stated that, according to phone records he had subpoenaed, "[r]ight before an incident there would be several calls, long calls" between Trisha, Mary, and Bruno. He said Trisha's phone calls to Mary and Bruno intensified "around visitation time."

On July 3, 2009, Smith participated in a supervised visit with M.W.F.S. and C.S.S.

---

8. DFPS records state:
 Upon further review of of the case by Program Director ... it was determined that the outcry made by the child which indicated that his father touched his penis with a fork over his clothing and "cut his penis" and pulled his ear does not meet the statutory definition of sexual abuse. Therefore, the disposition of the sexual abuse allegation will be changed from Unable to Determine to Ruled out. New letters will be generated for Mr. Smith for his records.

According to the supervisor's notes, M.W.F.S. stated during the visit that "Mom can step on his toes [and] to say that he hurts his penis [sic]. Mom tells him that [and] he said a lot [and] every day." Later, according to the notes, M.W.F.S. "tells Dad he does not care about him. He asked why [and] he replies because of the judge."

The divorce judge ordered Trisha to give Smith possession of the children for Thanksgiving in 2009. Trisha did so and Smith took the children to his sister's house in Arkansas. When Smith returned, he discovered that Trisha and Bruno had reported to Corpus Christi police that M.W.F.S. had made another outcry of sexual abuse against Smith. Specifically, they reported that M.W.F.S. stated that Smith had "licked his penis." Another investigation was initiated, and another SANE examination was conducted on December 3, 2009. The exam revealed no evidence of abuse.

Smith obtained possession of the boys as scheduled later that day. Smith testified that the boys "were in a very bad, ugly mood. They were very, very bad. They told me they hated me. They said, 'I hate you, Daddy; you're not my daddy.'" Suspicious, Smith began video recording his visit and immediately took the boys to their therapist. According to police records, M.W.F.S. reported that Trisha and Bruno told him "all the time" that Smith was not his dad, and they told him to say that he hated Smith. Smith testified that, as M.W.F.S. and C.S.S. were riding in his car, M.W.F.S. stated that "he didn't like it when people were telling him to say things

about, you know, his pee pee, that I was hurting his pee pee."

A few hours later, Smith returned the boys to Bruno. Bruno then took M.W.F.S. back to the hospital for another SANE examination. This SANE examination revealed a one-centimeter tear close to M.W.F.S.'s anus. The hospital reported the findings to police and DFPS. Corpus Christi police administered polygraph examinations to Trisha, Smith, and Bruno over the next several days. None of the polygraphs showed any deception. On December 21, 2009, M.W.F.S. was interviewed by DFPS and reported that Smith was a "bad man." When the investigator asked M.W.F.S. how he knew Smith was a bad man, M.W.F.S. stated "[h]is grandma and grandpa told him."

Bruno additionally took C.S.S. to the hospital for a SANE examination on December 21, 2009. The exam revealed no evidence of abuse.

As a result of the second December 3, 2009 SANE exam, police referred the allegations against Smith to the District Attorney. Smith and his daughters were interrogated. Around March of 2010, a grand jury began investigating Smith for sexually abusing M.W.F.S., and Trisha's attorney told Smith that he was going to be indicted. Smith testified that the feelings of "betrayal" and "fear" were "gut wrenching" and "horrifying."

The grand jury eventually declined to indict Smith. And, DFPS eventually ruled out as groundless all of the allegations made by Trisha and Bruno in 2009.[9]

9. In 2010, the relationship between Trisha and Bruno began to deteriorate, and Trisha allegedly coached M.W.F.S. to falsely accuse Bruno of sexual abuse. M.W.F.S. made an outcry to Smith, but Smith misinterpreted the outcry and believed that M.W.F.S. was accusing Larry of sexual abuse. Smith reported the outcry to DFPS but later learned that the accusation was made against Bruno, not Larry. In any event, the allegations were found, like all the other ones, to be groundless. Bruno, who had married Trisha in February 2010, filed for divorce three months later.

The trial court in the instant lawsuit appointed Jack Ferrell, Ph.D., a clinical and forensic psychologist, to examine the parties and make recommendations. Ferrell found that Trisha suffered from anxiety and depression as well as elements of bipolar disorder, borderline personality disorder, and narcissism. He stated that symptoms of these disorders would have started to manifest themselves at around age eighteen or nineteen, and that it "certainly should be" the kind of behavior that would be noticeable to parents. Ferrell concluded that Trisha fabricated the allegations of sexual abuse and coached M.W.F.S. to make his outcries. However, Ferrell denied that he had any "reliable evidence or data to come to a conclusion about [the Boses] being involved in the conspiracy with Trisha to coach [M.W.F.S.] to make up these stories. . . ." Farrell stated: "We've got the chatter. We've got depositions. We've got commentary. And that's it."

Smith testified that Trisha threatened suicide on multiple occasions, and at one point threatened to "kill [her]self and take the boys with [her]." Smith advised Mary of one of the suicide threats, but not all of them. According to Smith, Trisha "was in communication with [the Boses] very frequently. She was frequently looking to them for support and help making decisions. She was very dependent upon them for advice and support of all types because of her personality."

Larry and Mary asserted that their contact with the boys was limited after the October 23, 2008 child safety plan expired. However, DFPS notes suggested that they saw the children "daily" until Smith filed his lawsuit in 2010. Ferrell testified that "you do see things that suggest that these

grandparents had a significant relationship with the children . . . [a]nd they had been seeing the children routinely probably since birth."

Both Larry and Mary denied being fully aware of Trisha's mental health issues. But Larry testified at trial that, when Trisha was a teenager, she was admitted to a psychiatric hospital for inpatient treatment.[10] Larry stated that this treatment came about because of a "deterioration in her school work" but he stated "I'm not sure that I really remember any specific diagnosis that they came up with." He agreed, though, with Farrell's conclusions regarding Trisha's issues. Additionally, evidence showed that the Boses had filed suit in 2000 for custody of Trisha's older daughter, A.B., who was around four years old at the time. The petition, which alleged that it was in A.B.'s best interest for the Boses to be appointed joint managing conservators of the child, was eventually dismissed in 2001 for want of prosecution. But Larry testified that he and Mary have had custody of A.B. "most of the time" since then. Moreover, Larry acknowledged that he had previously stated in a deposition that Trisha asked the Boses for $20,000 so that she could settle a lawsuit brought by a former boyfriend regarding "some criminal charges that she had brought" against him "that were false." It is undisputed that the Boses failed to disclose any of this to DFPS or police.

Mary apologized on the record for her daughter's actions, acknowledging that "the stories I heard from her are obviously not true." Larry stated that he was not made aware that the allegations were found to be groundless until a divorce hearing on August 31, 2011. At that hear-

---

10. Smith testified that he did not know about Trisha's institutionalization until "[l]ong af-

ter" the marriage.

ing, the trial court ordered Trisha incarcerated for contempt for failing to comply with the SPO. As the parties left the courtroom that day, Trisha expressed willingness to sign documents terminating her parental rights to avoid jail time.[11] Smith, believing that it was in the boys' best interest to remove Trisha from their lives, agreed. A guardian ad litem appointed to represent the children also agreed that termination of Trisha's parental rights was in their best interest. The trial court signed an order terminating Trisha's parental rights on September 19, 2011.

Smith testified that, due to the entire ordeal, he was "unable to function" and had "extreme difficulty sleeping." He stated that his business was "almost destroyed" for two or three years. Lee stated that, as a result of the false allegations, Smith had difficulty "holding up" emotionally, and was having trouble working at his law practice. According to Lee, "there were days when [Smith] was just physically—just physically ill. There were days when you could—you would try to talk to him and he was—he was in a daze." Smith became "literally sick" when he learned about the grand jury investigation. At one point Lee feared that "we are losing him." Lee also testified that J.E.S. and V.A.S. were confused and frightened and Smith stated that the investigation was "incredibly humiliating" for them. Smith testified that the false allegations against him and J.E.S. "has cast a shadow over their lives that continues to this very day."

## C. Trial Court's Oral Findings

Following the presentation of testimony, the trial court granted a directed verdict to the Boses on Smith's negligent undertaking claim. The trial court also stated that "I don't believe I can find on a negligent activity" cause of action. However, with respect to the remaining pending claims, the court found the Boses liable. The trial court stated: (1) Mary interfered with Smith's possessory rights on the weekend of October 17–19, 2008; (2) Larry made defamatory statements regarding Smith to DFPS on October 31, 2008; and (3) Trisha, Bruno, and the Boses conspired to interfere with Smith's possessory rights.[12]

## D. Judgment and Written Findings

On May 12, 2014, the trial court rendered a written judgment awarding the following damages: $2.5 million to M.W.F.S. for mental anguish caused by the Boses' breach of fiduciary duty and negligence; $1.5 million to C.S.S. for mental anguish caused by the Boses' breach of fiduciary duty and negligence; $1 million to J.E.S. for injury to reputation caused by Larry's defamation; $500,000 to V.A.S. for injury to reputation caused by Larry's defamation; and $5,236,000 to Smith. The award to Smith was comprised of $3 million for mental anguish caused by the Boses' interference with possessory rights; $1.5 million for mental anguish caused by Larry's defamation; $500,000 for injury to

---

11. Lee testified:
 I walked out of this courtroom and I had not touched the button to go down the elevator when I was approached by the other lawyer saying, "We'll sign a parental termination immediately." I will never forget it, never. . . . I have represented people that have killed people and gone to their grave to dig them up. I have represented cases where people have been burned so bad they had to take bone from their nose to replant it places. This has been the most—worst traumatic case I have ever been in in 40 years.

12. The trial court also found that Bruno interfered with Smith's possessory rights on the weekends of March 6–8, December 4, and December 18–20, 2009.

reputation caused by Larry's defamation; and $236,000 for economic damages related to Smith's legal defense. The Boses and Bruno were ordered jointly and severally liable for all of those amounts, plus post-judgment interest of 5 percent per annum.

The trial court later rendered extensive findings of fact and conclusions of law. As to Smith's claims under the family code, the trial court concluded in part as follows:

5. After he turned three Trisha took or retained possession of M.W.F.S. in violation of Craig's possessory rights on important dates, including all relevant times before and including October 17, 2008; October 18, 2008; and October 19, 2008, and on many days thereafter.

6. Mary and Larry took affirmative acts that aided or assisted Trisha in her conduct in taking or retaining possession of M.W.F.S. in violation of Craig's possessory rights on important dates including October 17, 2008; October 18, 2008; and October 19, 2008.

7. On October 17, 2008, Mary took M.W.F.S. from Trisha's home and in doing so, aided or assisted Trisha in her conduct in taking or retaining possession of M.W.F.S. in violation of Craig's possessory rights. On October 18 and 19, 2008, Mary and Larry again obtained possession of M.W.F.S. from Trisha and retained him in their home in violation of Craig's possessory rights.

8. Additionally, Mary and Larry had an affirmative duty to respond fully and truthfully to questions by ongoing CPS and CCPD investigators. *Eberle v. Adams*, 73 S.W.3d 322, 332 (Tex.App.–Houston [1st Dist.] 2001, pet. denied). By failing to respond fully and in a non-defamatory fashion, Mary and Larry aided or assist-ed Trisha in her conduct in taking or retaining possession of M.W.F.S. in violation of Craig's possessory rights. *Id.*

9. The Court finds Trisha's conduct in wrongfully detaining and defaming Plaintiffs is the primary and root cause of damages awarded in this judgment. Mary and Larry had reasonable cause to believe that M.W.F.S. was the subject of a possessory order and that their respective actions were likely to violate such an order. The Court further finds and concludes Mary and Larry aided or assisted Trisha, and on the facts of this case joint and several liability is authorized.

As to the defamation claims, the court concluded in part as follows:

16. The Court finds that on October 31, 2008, Larry published false defamatory statements of fact regarding Craig to the Texas Department of Family and Protective Services.

17. These statements included a statement falsely accusing him of abusing his daughters and intending to tamper with a potential witness.

. . . .

23. Larry's statements are defamatory per se. *See Miranda v. Byles*, 390 S.W.3d 543, 552 (Tex.App.–Houston [1st Dist.] 2012, pet. denied) (holding accusation of sexual abuse of a child was defamatory per se); *Lozano v. Lozano*, 983 S.W.2d 787, 793 (Tex.App.–Houston [14th Dist.] 1998), *aff'd in part, rev'd in part on other grounds*, 52 S.W.3d 141 (Tex. 2001).

. . . .

33. The Court finds that Craig's claims are not barred by the statute of limitations.

. . . .

40. Larry failed to offer persuasive evidence that he was immune for his defamatory statements. He did not prove good faith. Furthermore the statements were made for the purpose of relieving Larry and Mary from protecting M.W.F.S. and C.S.S., and supervising Trisha. The Court finds the statements were made in bad faith.

41. On the facts of this case, the Court finds there is no other immunity or privilege, absolute or qualified, that protects Larry from liability for his defamatory statements for which judgment is rendered.

. . . .

49. The Court finds and concludes that, even if any qualified privilege applied to any statements by Larry or Bruno, such statements were made with reckless disregard of their truth or falsity and the statements are not privileged.

. . . .

53. The Court finds and concludes on October 31, 2008, Larry published defamatory statements of fact regarding J.E.S. and V.A.S. to the Texas Department of Family and Protective Services, alleging that they were victims of child abuse by Craig and were subject to brainwashing by Craig.

. . . .

59. Larry's statements were false. There is no believable evidence that Craig ever abused any of his children, sexually or otherwise or that J.E.S. or V.A.S. ever physically or sexually abused M.W.F.S.

As to the negligence and breach of fiduciary duty claims, the trial court concluded in part as follows:

84. The Court finds and concludes Mary and Larry owed duties of care to place the interests of M.W.F.S. and C.S.S. before their own. These duties arose from the facts and circumstances of this case.

85. Mary and Larry also owed a duty to protect M.W.F.S. and C.S.S. and prevent a dangerous person, Trisha, from harming them and others associated with them, including Plaintiffs. *Isbell v. Ryan*, 983 S.W.2d 335, 337 (Tex.App.–Houston [14th Dist.] 1998, no pet.); *Cain v. Cain*, 870 S.W.2d 676, 680 (Tex. App.–Houston [1st Dist.] 1994, writ denied). Mary and Larry owed a duty to fully disclose material information about Trisha to CPS, including information showing she was peculiarly likely to use defamation and wrongful detention involving M.W.F.S. and C.S.S. to harm Plaintiffs. *Golden Spread Council, Inc. v. Akins*, 926 S.W.2d 287, 289 (Tex.1996).

. . . .

87. The Court finds Mary and Larry owed a fiduciary duty to M.W.F.S. and C.S.S.

88. The Court finds Mary and Larry breached these duties of care and proximately caused harm.

89. The Court finds all Plaintiffs proximately suffered compensable harm from these breaches. M.W.F.S. and C.S.S. were used as tools or weapons to harm all Plaintiffs. In the process, M.W.F.S. and C.S.S. suffered repeated S.A.N.E. exams, separation from Craig, V.A.S., and J.E.S., investigations, and prolonged contact with harmful persons. Harm to other Plaintiffs has been discussed above and is incor-

porated here by reference. Mary and Larry could have and should have prevented this outrageous series of events from occurring by complying with their duties of care. Had either simply told CPS at the inception on October 18, 2008, that Trisha had mental problems and a behavior pattern of falsely defaming former men in her life, ensuing events would not have happened or would have been minimized.

. . . .

93. The Court finds Mary is 51% responsible for breaching fiduciary duties to M.W.F.S. and C.S.S. because she interacted with Trisha more than Larry. Mary had far more contact with Trisha, M.W.F.S. and C.S.S. and has greater fault for failing to place their interests before her own. For breach of this duty, the Court finds Larry is 29% responsible; Trisha 10%; Bruno 10% responsible; and all other responsible third parties are 0% responsible. Trisha is less responsible because she had mental issues which should have been well known to Mary and Larry. . . .

9[4]. The Court finds Larry is 51% responsible for breaching negligence duties because his interactions with CPS caused severe harm, increased the harm, diminished Craig's ability to protect his children, and promoted Trisha in a time and manner that was critical. He should have fully disclosed his information about Trisha's dangerous propensities to CPS and truthfully disclosed oth-

er facts. The Court finds Mary is 29% responsible; Trisha 10%; Bruno 10% responsible; and all other responsible third parties are 0% responsible. Trisha is less responsible because she had mental issues which should have been well known to Mary and Larry.

The Boses filed a motion for additional findings of fact and conclusions of law, which was denied. They then filed their notice of appeal on August 4, 2014.[13]

## II. MOTION TO STRIKE SUPPLEMENTAL RECORD

■ On October 16, 2014, the Boses filed with this Court a "Supplemental Clerk's Record" purportedly containing the entire clerk's record from the consolidated divorce and custody proceeding involving Smith and Trisha. Smith has moved to strike the record on grounds that (1) the divorce/custody records were not made part of the trial court record in the instant case until after the trial court's plenary power expired; and (2) the divorce/custody records are "inherently unreliable" because they were not certified by the trial court clerk. Smith also argues in his motion to strike that, because the Boses failed to timely present the divorce/custody records at issue for inclusion in the trial court clerk's record, the Boses' evidentiary sufficiency arguments must fail.

The record shows that, during his cross-examination of Smith at trial, the Boses' counsel queried Smith as to certain plead-

---

13. We granted motions filed by the parties to exceed the word count limits provided in the Texas Rules of Appellate Procedure for appellate briefs. *See* TEX. R. APP. P. 9.4(i)(2)(B), (i)(4). The Boses have filed a 90–page initial brief containing 23,533 words as well as a 49–page reply brief containing 12,479 words; Smith has filed a 101–page brief containing 21,866 words and 657 footnotes.

ings filed in the divorce/custody case,[14] including Trisha's original petition for divorce, Smith's counter-petition for divorce, and the final divorce decree. Later, the following colloquy occurred:

> [Boses' counsel]: For record purposes I'm going to ask the Court to take judicial notice of those pleadings that I made reference to from that file because I don't know if people upstairs go, "You didn't do that or not do that." So I'm going to ask you to—
>
> THE COURT: I'm going to take judicial notice of the contents of Cause No. 06–1893–D, In the Matter of Trisha Bos Smith versus Craig Smith, and then vice versa, the counter petition, and In the Interest of the Children. Okay. All right. The files as well as the hearings. Okay. Go ahead.

No party objected to this declaration by the trial court. After the parties rested, during a discussion on the Boses' motion for directed verdict, the trial court indicated that she considered "prior hearings" from the divorce/custody case in making determinations in the instant case.[15]

■ A trial court may generally take judicial notice of its own records in a case involving the same subject matter between the same or practically the same parties. *Gardner v. Martin,* 162 Tex. 156, 345 S.W.2d 274, 276 (1961); *McCurry v. Aetna Cas. & Sur. Co.,* 742 S.W.2d 863, 867 (Tex. App.–Corpus Christi 1987, writ denied).

However, testimony from a previous trial cannot be considered by the trial judge at a subsequent trial unless it is admitted into evidence at the subsequent proceeding. *Escamilla v. Estate of Escamilla by Escamilla,* 921 S.W.2d 723, 726 (Tex.App.–Corpus Christi 1996, writ denied) (noting that "[t]he trial judge's own memory of what the witness may have said at the prior proceeding is insufficient to substitute for an accurate and properly authenticated record of that testimony"); *Amco Mesh & Wire Co. v. Stewart,* 474 S.W.2d 740, 741–42 (Tex.Civ.App.–Houston [1st Dist.] 1971, no writ). Accordingly, in order for testimony at a prior hearing or trial to be considered at a subsequent proceeding, the transcript of such testimony must be properly authenticated and entered into evidence. *Escamilla,* 921 S.W.2d at 726; *see Briones v. Solomon,* 769 S.W.2d 312, 319 (Tex.App.–San Antonio 1989, writ denied); *Ex parte Turner,* 478 S.W.2d 256, 258 (Tex.Civ.App.–Houston [1st Dist.] 1972, orig. proceeding).

■ As appellants, the Boses were required to provide this Court with a record sufficient to enable us to conduct a meaningful substantive review of the trial court's findings. *See Vernco Constr., Inc. v. Nelson,* 460 S.W.3d 145, 151 (Tex.2015) (citing *Schafer v. Conner,* 813 S.W.2d 154, 155 (Tex.1991) (holding that an appellant challenging sufficiency of the evidence to support the trial court's judgment cannot meet that burden without presenting a

---

14. The trial court judge in the instant case, Judge Angelica Hernandez, also presided over the divorce/custody proceedings from January 2011 onward. Prior to January 2011, Judge Manuel Bañales presided over the divorce/custody proceedings.

15. Specifically, the trial court remarked as follows during argument on the Boses' motion for directed verdict:

> Right. But we're past arguing under theory. I think we're past arguing under summary judgment. I think now what we move into is, quite honestly, arguing the evidence. Because I'm not in a vacuum anymore. Now I know. I have all the evidence before me and from the prior hearings that I've taken judicial notice of. And I think that on the 31st I think everybody involved in this knew she wasn't a perfect mother. Okay? I'm just telling you. Let me tip my hand to you. I don't find that testimony or evidence credible.

sufficient record on appeal because it is presumed that the omitted portions of the record support the trial court's judgment); *Guthrie v. Nat'l Homes Corp.*, 394 S.W.2d 494, 495 (Tex.1965) (observing that, absent a reporter's record, the court must presume the evidence at trial supported the jury's finding)). The rules of civil procedure allow the Boses to supplement the trial court record at any time when clearly "necessary to the due administration of justice." *See* TEX. R. CIV. P. 270 ("When it clearly appears to be necessary to the due administration of justice, the court may permit additional evidence to be offered at any time; provided that in a jury case no evidence on a controversial matter shall be received after the verdict of the jury."). However, Smith argues that evidence may not be offered after the court's plenary power over the case expires. *See* TEX. R. CIV. P. 329b(d) (providing that "[t]he trial court, regardless of whether an appeal has been perfected, has plenary power to grant a new trial or to vacate, modify, correct, or reform the judgment within thirty days after the judgment is signed"); *see also Quality Beverage, Inc. v. Medina*, 858 S.W.2d 8, 11 (Tex.App.–Houston [1st Dist.] 1993, no writ) (stating that evidence regarding prejudgment interest must be presented prior to the expiration of plenary power).

Even assuming that the trial court record could be properly supplemented with the divorce/custody records after the trial court's plenary power expired, the supplemental record filed in this case does not appear to be complete. In particular, although the supplemental clerk's record contains a transcript of a hearing in the divorce/custody case that took place on August 31, 2011, it does not include a transcript of an interview conducted by the trial court with M.W.F.S. in chambers during that hearing.

In light of the foregoing, we hereby grant Smith's motion to strike the supplemental record filed by the Boses. Smith argues that we must apply the presumption that the omitted portions of the record supported the trial court's findings, *see Vernco Constr., Inc.*, 460 S.W.3d at 151, and that we therefore must overrule each of the Boses' issues to the extent that they assert that the evidence was legally and factually insufficient to support the trial court's findings and conclusions. We decline to do so. The records from the divorce/custody case were improperly noticed by the trial court because they were not made part of the trial court record in the instant case. When evidence is the subject of improper judicial notice, it amounts to no evidence. *Guyton v. Monteau*, 332 S.W.3d 687, 693 (Tex.App.–Houston [14th Dist.] 2011, no pet.) (finding no evidence to support trial court's ruling based on judicial notice of "all documents and testimony ever admitted in this case on any subject" because records were not contained in the record); *Augillard v. Madura*, 257 S.W.3d 494, 503 n. 14 (Tex.App.–Austin 2008, no pet.) (finding evidence legally insufficient to support judgment where trial court took judicial notice of testimony from a hearing held thirteen months earlier in the same case, but the evidence was not offered in the second hearing); *Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 161 S.W.3d 531, 540 (Tex. App.–San Antonio 2004, pet. denied) (finding evidence legally insufficient to support damage award based on trial court's judicial notice of evidence offered at a hearing nine months earlier in the same case); *Escamilla*, 921 S.W.2d at 726 (noting that testimony from prior proceeding noticed by trial court but not admitted into evidence constituted "no evidence"); *but see Estate of York*, 934 S.W.2d 848, 851 (Tex. App.–Corpus Christi 1996, writ denied) (summarily overruling cross-appellant's is-

sues challenging sufficiency of the evidence to support trial court's findings because judicially-noticed records from a prior proceeding in the same court were not made part of the record in the case on appeal). Because the divorce/custody records were improperly noticed, they were never part of the record before the trial court and their absence from the appellate record is not an "omission" that would trigger the presumption. Accordingly, we will evaluate the Boses' evidentiary sufficiency issues without considering the divorce/custody records.

### III. DISCUSSION

The Boses raise 21 issues on appeal. First, with respect to the trial court's findings under the family code, they contend: (1) there was legally and factually insufficient evidence to support the findings; (2) the trial court erred by failing to issue separate findings as to each alleged instance of interference; (3) there was legally and factually insufficient evidence of proximate causation; and (4) there was legally and factually insufficient evidence of damages, or in the alternative, the damages were excessive.

Second, with respect to the defamation claims, the Boses contend: (5) the trial court erred by failing to issue separate findings as to each alleged defamatory statement; (6) the defamation claims as to Smith were not supported by the pleadings or by factually or legally sufficient evidence; (7) the defamation claims as to J.E.S. and V.A.S. were not supported by the pleadings or by factually or legally sufficient evidence; (8) there was legally and factually insufficient evidence of proxi-

mate causation; (9) injury cannot be presumed because the statements were not defamatory per se; (10) the alleged defamatory statements were privileged because they were made during the course of a "confidential DFPS investigation"; (11) there was legally and factually insufficient evidence of damages to Smith, or in the alternative, the damages were excessive; and (12) there was legally and factually insufficient evidence of damages to J.E.S. and V.A.S., or in the alternative, the damages were excessive.

Third, as to the negligence and fiduciary duty findings, the Boses contend: (13) the findings were not supported by the pleadings; (14) the negligence claim is barred by limitations; (15) there was legally and factually insufficient evidence to support the findings; (16) the trial court erred in determining that they owed a duty; (17) there was legally and factually insufficient evidence that they breached the duty; (18) there was legally and factually insufficient evidence of proximate causation; (19) there was legally and factually insufficient evidence of damages, or in the alternative, the damages were excessive; (20) the trial court erred in failing to issue separate findings as to each damage element; and (21) there was legally and factually insufficient evidence to support the trial court's comparative fault findings.[16]

### A. Standard of Review

 In an appeal from a bench trial, the trial court's findings of fact have the same weight as a jury verdict. *Aland v. Martin*, 271 S.W.3d 424, 428–29 (Tex. App.–Dallas 2008, no pet.); *Butler v.*

---

**16.** The Boses raise additional issues arguing that there was legally and factually insufficient evidence that they were engaged in a conspiracy with Trisha, and that the trial court erred by admitting testimony regarding conspiracy. The Boses acknowledge, howev-

er, that the trial court did not find against them on Smith's conspiracy claim—instead, the trial court found only that Bruno and Trisha entered into a conspiracy. We therefore do not address those issues.

*Comm'n for Lawyer Discipline*, 928 S.W.2d 659, 662 (Tex.App.–Corpus Christi 1996, no writ). We review the sufficiency of the evidence supporting the findings by applying the same standards we use in reviewing the legal and factual sufficiency of the evidence supporting a jury verdict. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994); *Aland*, 271 S.W.3d at 429. Under those standards, a legal sufficiency challenge will be sustained when the record confirms either: (a) a complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex.2005). "What might otherwise be a question of fact becomes one of law when the fact is not in dispute or is conclusively established." *Reliance Nat'l Indem. Co. v. Advanced Temporaries, Inc.*, 227 S.W.3d 46, 50 (Tex.2007); *Bianchi v. State*, 444 S.W.3d 231, 245 (Tex. App.–Corpus Christi 2014, no pet.). The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller*, 168 S.W.3d at 822. We view the evidence in the light most favorable to the finding, indulge every reasonable inference in support of the finding, credit favorable evidence if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not. *Id.* at 807, 822.

■ In reviewing factual sufficiency, we consider all the evidence in a neutral light and will set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709

S.W.2d 175, 176 (Tex.1986); *Corpus Christi Day Cruise, LLC v. Christus Spohn Health Sys. Corp.*, 398 S.W.3d 303, 311 (Tex.App.–Corpus Christi 2012, pet. denied). In a bench trial, the trial court assesses the credibility of the witnesses, determines the weight to be given to their testimony, and resolves conflicts and inconsistencies in the testimony. *See City of Keller*, 168 S.W.3d at 819; *Hinkle v. Hinkle*, 223 S.W.3d 773, 778 (Tex.App.–Dallas 2007, no pet.).

■ We review a trial court's conclusions of law de novo, evaluating them independently and determining whether the court correctly drew the legal conclusions from the facts. *In re M.P.A.*, 364 S.W.3d 277, 289 (Tex.2012); *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex.2002). "A legally correct judgment based on findings of fact made after a trial on the merits cannot be set aside on appeal if the findings are supported by sufficient evidence." *IKB Indus. (Nigeria) Ltd. v. Pro–Line Corp.*, 938 S.W.2d 440, 442 (Tex. 1997). Conclusions of law will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence. *Mack v. Landry*, 22 S.W.3d 524, 528 (Tex.App.–Houston [14th Dist.] 2000, no pet.).

## B. Family Code Chapter 42

### 1. Liability

■ The Boses' first issue challenges the sufficiency of the evidence supporting the trial court's findings under chapter 42 of the Texas Family Code. Chapter 42 provides a civil remedy for interference with a possessory interest in a child. *See* TEX. FAM. CODE ANN. § 42.002(a) (West, Westlaw through 2015 R.S.). Under section 42.002, "[a] person who takes or retains possession of a child or who conceals the whereabouts of a child in violation of a possessory right of another person may be

liable for damages to that person." *Id.* A "possessory right" is defined as "a court-ordered right of possession of or access to a child, including conservatorship, custody, and visitation." *Id.* § 42.001 (West, Westlaw through 2015 R.S.). "A possessory right is violated by the taking, retention, or concealment of a child at a time when another person is entitled to possession of or access to the child." *Id.* § 42.002(b).

Section 42.003 states that "[a] person who aids or assists in conduct for which a cause of action is authorized by this chapter is jointly and severally liable for damages." *Id.* § 42.003(a) (West, Westlaw through 2015 R.S.). Damages may include attorney's fees incurred in "enforcing the order and prosecuting the suit" as well as "mental suffering and anguish" incurred as a result of the violation of the order. *Id.* § 42.006 (West, Westlaw through 2015 R.S.). However,

> [a] person who was not a party to the suit in which an order was rendered providing for a possessory right is not liable unless the person at the time of the violation:
>
> (1) had actual notice of the existence and contents of the order; or
>
> (2) had reasonable cause to believe that the child was the subject of an order and that the person's actions were likely to violate the order.

*Id.* § 42.003(b).

Here, it is undisputed that Trisha violated section 42.002 by taking or retaining possession of M.W.F.S. on multiple occasions when Smith was entitled to possession under the SPO.[17] The trial court found that the Boses "took affirmative acts that aided or assisted Trisha" in her interfer-

ence "on important dates" including the weekend of October 17–19, 2008, and that they "had reasonable cause to believe that M.W.F.S. was the subject of a possessory order and that their respective actions were likely to violate such an order."

We conclude that these findings are supported by the evidence. Smith testified that, on October 14, he informed Mary that, under the SPO, he had the right to possession of M.W.F.S. that weekend, and he was going to pick up the child on Friday at 6:00 p.m. Nevertheless, Mary took M.W.F.S. to a birthday party at Trisha's request, shortly before the scheduled pick-up time on Friday, October 17. The next day, Mary agreed to take care of M.W.F.S. until a DFPS meeting on October 23, because Trisha told her that a police officer told Trisha to stay away from the children until they went to DFPS. The evidence further showed that Trisha made long phone calls to the Boses before and after Smith's unsuccessful attempts to visit with M.W.F.S. in June and July of 2008, and on October 18, 2008. Finally, it is undisputed that the Boses kept the child from October 23, to December 8, 2008, and that this time period included weekends during which Smith was entitled to access under the SPO.

The Boses argue that they cannot be held liable under the family code for their possession of M.W.F.S. between October 23 and December 8, 2008, because Smith agreed to the DFPS's "child safety plan" under which the Boses were to have possession for that time period. *See* Tex. Fam. Code Ann. § 42.007 (West, Westlaw through 2015 R.S.) ("The defendant may plead as an affirmative defense that the

---

17. The Boses argue as part of their first issue that the evidence did not support a finding that they violated section 42.002. However, the trial court did not find that the Boses violated section 42.002; it found that Trisha violated that section and the Boses violated section 42.003.

defendant acted in violation of the order with the express consent of the plaintiff."). Smith did consent to the plan, but only because the alternative would have been placing the children in foster care. Nevertheless, the Boses cannot rely on a consent defense because they did not plead it as an affirmative defense, nor did the trial court make any finding as to consent. *See* TEX. R. CIV. P. 94 (stating that a "party shall set forth affirmatively" any affirmative defense); *Sears, Roebuck & Co. v. Nichols,* 819 S.W.2d 900, 907 (Tex.App.–Houston [14th Dist.] 1991, writ denied) ("[A] party asserting an affirmative defense in a trial before the court must request findings in support of such a defense in order to avoid waiver on appeal.").

 The trial court also found that the Boses aided or assisted Trisha "[b]y failing to respond fully and in a non-defamatory fashion" to DFPS and Corpus Christi police. The Boses note correctly that there was no evidence that they made any statements to Corpus Christi police. But the evidence did establish that, in their interactions with DFPS, the Boses concealed information regarding Trisha's history of fabricating allegations and her fitness as a mother. Though "lack of candor" is not a "substitute for evidence," it may be probative as to credibility. *Lozano v. Lozano,* 52 S.W.3d 141, 154 (Tex. 2001). Here, the trial court could have considered the Boses' lack of candor in their interactions with DFPS in making the determination that they aided or assisted Trisha in withholding possession.

From this evidence, the trial court could have reasonably inferred that the Boses aided or assisted Trisha in withholding possession of M.W.F.S., and that the Boses had reasonable cause to believe that Smith was entitled to possession during the times possession was withheld. *See* TEX. FAM. CODE ANN. § 42.003(b)(2). We conclude that there was legally and factually sufficient evidence to support the trial court's finding that the Boses were liable under section 42.003 of the family code. The Boses' first issue is overruled.

## 2. Causation

By their third issue, the Boses contend that the evidence was insufficient to show that their aid and assistance of Trisha's interference proximately caused the damages suffered by Smith. In particular, they argue that there is no evidence they caused Trisha and Bruno to withhold access to M.W.F.S. any time after the "child safety plan" expired in December 2008. They further argue that Mary did not cause any damages to Smith by taking M.W.F.S. to a birthday party on October 17, 2008, "because it is undisputed that Trisha would have prevented visitation that night regardless."

 In *Lozano v. Lozano,* the Fourteenth District Court of Appeals concluded that, when evaluating whether a person's aiding and assisting the violation of a possession order proximately caused the claimant's damages, "the relevant cause is violation of the court order, not the actions of those allegedly aiding and assisting the person violating the court order." *Lozano v. Lozano,* No. 14–96–01555–CV, 2003 WL 22076661, at *2 (Tex.App.–Houston [14th Dist.] Sept. 9, 2003, no pet.) (mem. op. on remand). In other words, the relevant inquiry is not whether the defendant's aid or assistance caused the plaintiff to suffer harm, but whether the primary actor's conduct—which the defendants aided and assisted—caused the plaintiff to suffer harm. Here, it is undisputed that Trisha's conduct caused Smith to suffer harm, and we have already concluded that the evidence was sufficient to establish that the Boses aided and assisted Trisha in violation of family code section 42.003. Accordingly, we also conclude that the evidence

was legally and factually sufficient to establish causation. The Boses' third issue is overruled.

### 3. Mental Anguish Damages

By their fourth issue, the Boses contend that the evidence was legally and factually insufficient to support the trial court's findings as to mental anguish damages caused by the Boses' family code violations.[18] Generally, an award of mental anguish damages must be supported by direct evidence of the nature, duration, and severity of mental anguish establishing a "substantial disruption in the plaintiff's daily routine" or a "high degree of mental pain and distress" that is "more than mere worry, anxiety, vexation, embarrassment, or anger." *Parkway Co. v. Woodruff,* 901 S.W.2d 434, 444 (Tex.1995); *see Serv. Corp. Int'l v. Guerra,* 348 S.W.3d 221, 231 (Tex.2011).

In reviewing a mental anguish award, we must be cognizant that "[t]he process of awarding damages for amorphous, discretionary injuries such as mental anguish or pain and suffering is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss." *Figueroa v. Davis,* 318 S.W.3d 53, 62 (Tex.App.–Houston [1st Dist.] 2010, no pet.) (quoting *HCRA of Tex., Inc. v. Johnston,* 178 S.W.3d 861, 871 (Tex.App.–Fort Worth 2005, no pet.)). Given the lack of objective measures, so long as some compensable mental anguish has been established, the task of fixing the exact amount of damages is "generally left to the discretion of the fact finder." *Id.* (quoting *Pentes Design, Inc. v. Perez,* 840 S.W.2d 75, 80 (Tex.App.–Corpus Christi 1992, writ denied)).

The Boses first contend by their fourth issue that the assessment of mental anguish damages must be limited to the damages caused by Trisha's withholding of access to the children during the weekend of October 17 to 19, 2008, because that is the only time when the trial court specifically found that the Boses aided Trisha. We disagree. The trial court, in its findings of fact, did not state that the weekend of October 17 to 19 was the only time that the Boses aided Trisha. Instead, the record supported the trial court's implicit finding that the Boses engaged in an ongoing course of conduct that had the effect of aiding Trisha in interfering with Smith's possessory rights over a significant period of time. In particular, there was evidence that Trisha made long telephone calls to Mary that intensified before and after visitation was supposed to take place. As late as December 2009, M.W.F.S. reported to police that the Boses told him that Smith was a bad man. The damages suffered by Smith, for which the Boses are liable, are therefore not limited to the effects of one weekend of withheld visitation.

The evidence supporting compensable mental anguish included Smith's testimony that, as a result of the entire ordeal, he was "unable to function" and had "extreme difficulty sleeping." He stated that his business was "almost destroyed" for two or three years. Lee stated that, as a result of the false allegations, Smith had difficulty "holding up" emotionally and was having trouble working at his law practice. According to Lee, "there were days when [Smith] was just physically—just physically ill. There were days when you could—

---

18. To the extent the Boses argue that the damages award was excessive, that is encompassed within the factual sufficiency analysis. *See Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406 (Tex.1998) ("The standard of review for an excessive damages complaint is factual sufficiency of the evidence.... The court of appeals should employ the same test for determining excessive damages as for any factual sufficiency question.").

you would try to talk to him and he was—he was in a daze." Smith became "literally sick" when he learned about the grand jury investigation. At one point Lee feared that "we are losing him." Because of Trisha's false allegations of abuse, which were aided and abetted by the Boses, Smith was subjected to numerous interrogations by DFPS and police. His young children were subjected to repeated intrusive sexual assault examinations. Smith was deprived of the companionship of his children and was investigated by a grand jury for heinous crimes which he did not commit.

This testimony is legally sufficient to establish that Smith suffered a "high degree of mental pain and distress" that is "more than mere worry, anxiety, vexation, embarrassment, or anger." *See Parkway Co.*, 901 S.W.2d at 444. Further, viewing the evidence in a neutral light, we cannot say the damages award was so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176. Although no witness testified as to a precise dollar figure that would accurately compensate Smith, the trial court could have reasonably inferred, from the unique facts and circumstances of this case, that the award of $3,000,000 to Smith was "fair and reasonable." *See Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996) ("There must be evidence that the amount found is fair and reasonable compensation.").

### 4. Economic Damages

Finally, the Boses argue by their fourth issue that the award of $236,000 in attorney's fees as economic damages under the family code was improper. They contend that some of the fees awarded were im-proper and supported by insufficient evidence; and that the trial court erred by failing to require Smith to segregate the recoverable from the non-recoverable fees.

Family code chapter 42 permits the recovery of "the actual costs and expenses incurred, including attorney's fees, in: (A) locating a child who is the subject of the order; (B) recovering possession of the child if the petitioner is entitled to possession; and (C) enforcing the order and prosecuting the suit." TEX. FAM. CODE ANN. § 42.006(a)(1) (West, Westlaw through 2015 R.S.).[19] The only evidence as to recoverable fees was Lee's testimony. Lee stated that Smith paid his firm $236,877.58. When asked whether "[m]ost of the work that you did in this case, if not all of the work you did in this case, [arose] because of these allegations of child abuse," Lee replied, "Yes, sir." Lee acknowledged that "attorney's fees were in fact asked for" in the divorce/custody proceedings and that he has never represented Smith in the suit filed pursuant to chapter 42.

■ As to Smith's failure to segregate recoverable from non-recoverable fees, Smith contends that the Boses failed to preserve this issue for review. We agree. The Boses first requested segregated findings in their request for additional findings of fact and conclusions of law. Thus, the trial court was never asked to compel Smith to present evidence segregating recoverable from non-recoverable fees. Under these circumstances, we do not believe that a request for additional findings was sufficient to preserve error in the failure to segregate. *See* TEX. R. APP. P. 33.1(a)(1); *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 389 (Tex.1997) ("[I]f no one objects to the

---

19. It is undisputed that Smith did not incur any costs or expenses in "locating" M.W.F.S. or C.S.S. *See* TEX. FAM. CODE ANN. § 42.006(a)(1)(A) (West, Westlaw through 2015 R.S.).

fact that the attorney's fees are not segregated as to specific claims, then the objection is waived."); *see also Red Rock Properties 2005, Ltd. v. Chase Home Fin., L.L.C.,* No. 14–08–00352–CV, 2009 WL 1795037, at *7 (Tex.App.–Houston [14th Dist.] June 25, 2009, no pet.) (mem.op.) ("Because [appellant] failed to object to [appellee]'s failure to segregate attorney's fees at the time in which the evidence of attorney's fees was presented and considered by the trial court, its objection is untimely and, thus, any error is waived."); *Kleas v. BMC W. Corp.,* No. 03–05–00190–CV, 2008 WL 5264883, at *5–6 (Tex.App.–Austin Dec. 19, 2008, pet. denied) (mem. op.) (holding that raising segregation of attorney's fees for the first time in a motion for new trial did not preserve issue for appellate review where party failed to object while the issue was litigated before the trial court).

Nevertheless, the Boses also contend by this issue that the evidence was legally and factually insufficient to support at least part of the economic damages award. When a case is tried to the bench, such complaints may be raised for the first time on appeal. *See* TEX. R. APP. P. 33.1(d). ▮▮▮ "Unsegregated attorney's fees for the entire case are some evidence of what the segregated amount should be." *Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 314 (Tex.2006). Accordingly, the evidence was legally sufficient to support the award. But it is apparent from the record that a significant portion of the $236,877.58 paid by Smith to Lee's firm was not attributable to "recovering possession" of M.W.F.S. or C.S.S. or "enforcing the order and prosecuting the suit" relating to the Boses' interference with Smith's possessory rights. *See* TEX. FAM. CODE ANN. § 42.006(a)(1). Instead, the only testimony relevant to the issue provided that "most if not all" of the $236,000 in fees incurred by Smith was attributable to defending Smith from the false charges of abuse, which is not recoverable under the statute. Accordingly, the evidence was factually insufficient to support the award. We will therefore reverse the trial court's order awarding economic damages under the family code and remand for further proceedings. *See Tony Gullo Motors,* 212 S.W.3d at 314 (holding "an unsegregated damages award requires a remand").

The Texas Rules of Appellate Procedure provide that we may not order a new trial solely on unliquidated damages if liability is contested. TEX. R. APP. P. 44.1(b). Therefore, even though we have already found sufficient evidence to support the trial court's findings as to liability and mental anguish damages under the family code, we must remand for a new trial on both liability and damages under the family code in light of our holding that the economic damages award was improper. *See id.; Estrada v. Dillon,* 44 S.W.3d 558, 562 (Tex.2001); *see also Peshak v. Greer,* 13 S.W.3d 421, 428 (Tex.App.–Corpus Christi 2000, no pet.) (remanding for new trial on liability and damages under rule 44.1(b) after affirming judgment of liability and actual damages but reversing punitive damages award). However, should Smith voluntarily remit the $236,000 awarded as family code economic damages within 15 days of our judgment, the error will be cured and the trial court's family code liability and mental anguish findings will be affirmed in accordance with the remittitur. *See* TEX. R. APP. P. 46.5 ("If a court of appeals reverses the trial court's judgment because of a legal error that affects only part of the damages awarded by the judgment, the affected party may—within 15 days after the court of appeals' judgment—voluntarily remit the amount that the affected party believes will cure the reversible error.... If the remittitur is

timely filed and the court of appeals determines that the voluntary remittitur cures the reversible error, then the court must accept the remittitur and reform and affirm the trial court judgment in accordance with the remittitur."); *Peshak,* 13 S.W.3d at 428.

## C. Defamation of J.E.S. and V.A.S.

██ By part of their seventh issue, the Boses contend that the pleadings did not support the trial court's finding that Larry defamed J.E.S. and V.A.S. by "alleging that they were victims of child abuse by Craig and were subject to brainwashing by Craig." *See* Tex. R. Civ. P. 301 ("The judgment of the court shall conform to the pleadings...."). Smith's live petition broadly alleged that Larry "defamed Plaintiffs by misrepresenting Trisha Bos had superior parenting skills and Craig S. Smith was a 'nut' and other untrue and derogatory statements." [20]

██ We agree that the pleadings did not support the trial court's findings as to the defamation of J.E.S. and V.A.S. Texas is a fair notice pleading state. *See* Tex. R. Civ. P. 45(b) (requiring a party's pleadings to give "fair notice" to the opponent); Tex. R. Civ. P. 47(a) (requiring a plaintiff's pleadings to give "fair notice of the claim involved"). When a pleading is not challenged by special exceptions, as here,[21] we construe it liberally in favor of the pleader. *Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 897 (Tex.

2000). We look to the pleader's intent and supply every fact "that can reasonably be inferred from what is specifically stated." *Roark v. Allen,* 633 S.W.2d 804, 809 (Tex. 1982). Even construing Smith's live petition liberally in his favor, we cannot conclude that it gave fair notice to the Boses that they were being accused of defaming J.E.S. and V.A.S. by naming them as "victims of child abuse" and "subject to brainwashing." We will therefore reverse the trial court's judgment and its assessment of damages related to the Boses' alleged defamation of J.E.S. and V.A.S. The Boses' seventh issue is sustained.[22]

## D. Defamation of Smith

██ By their eighth issue, the Boses argue that there was insufficient evidence to support the trial court's finding that Larry's defamatory statements were the proximate cause of any damages suffered by Smith. *See Salinas v. Salinas,* 365 S.W.3d 318, 321 (Tex.2012) (noting that a defamation plaintiff must prove that the allegedly defamatory statement proximately caused the plaintiff's damages). The Boses note that: (1) there was no evidence that "DFPS actually believed the statements or took them seriously"; (2) there was no evidence that "DFPS revealed the statements to anyone outside those involved in the investigation"; (3) DFPS only considered Larry's statements with respect to the October 18, 2008 report; (4) Smith did not learn about the statements until December 2009; and (5) DFPS docu-

---

**20.** In a section entitled "Damages," Smith's live petition also mentioned that "J.E.S. was falsely accused of sexually assaulting M.W.F.S." But the trial court did not enter a finding as to that allegation; instead, it concluded only that J.E.S. and V.A.S. were defamed by being named as "victims of child abuse" and "subject to brainwashing."

**21.** The Boses filed special exceptions to Smith's first amended petition contending in

part that "Plaintiff is required to specifically set out the defamatory comments and to whom they were allegedly published." However, they did not assert this special exception following the filing of Smith's live petition.

**22.** Because of our disposition of this issue, we need not address the Boses' seventh or twelfth issues. *See* Tex. R. App. P. 47.1.

mented "substantial information apart from Larry's statements" and ultimately ruled in Smith's favor.

 Proximate cause has two components: (1) foreseeability and (2) cause-in-fact. *Rodriguez–Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex.2013); *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 774 (Tex.2010). For a negligent act or omission to have been a cause-in-fact of the harm, the act or omission must have been a substantial factor in bringing about the harm, and absent the act or omission— i.e., but for the act or omission—the harm would not have occurred. *Rodriguez–Escobar*, 392 S.W.3d at 113. There may be more than one proximate cause of an occurrence. *Del Lago Partners*, 307 S.W.3d at 774.

We agree with the Boses that the record reveals legally insufficient evidence that Larry's statements were the proximate cause of any damages suffered by Smith. The statements at issue directly pertained only to allegations of abuse against J.E.S. and V.A.S., not M.W.F.S. and C.S.S. To the extent Larry's statements regarding Smith may have "bolstered" Trisha's "credibility and suitability as a parent," as the trial court found, we do not believe the evidence supported a finding that this constituted a substantial factor in the decisions made by DFPS and the district attorney. Smith argues that "DFPS records were provided to [police] officer Brandi Moss, who relied upon them when creating her report and presenting the case to the district attorney for prosecution." However, Moss's several incident reports, each of which were entered into evidence and which culminated in the grand jury investigation of Smith, did not mention Larry's statements to DFPS. There was no other evidence from which a trier of fact could rationally infer that Smith suffered any harm that would not have occurred but for Larry's statements to DFPS regarding Smith on October 31, 2008. *See Rodriguez–Escobar*, 392 S.W.3d at 113. Accordingly, the evidence was legally insufficient to support the trial court's judgment finding the Boses liable for damages for defaming Smith. We sustain the Boses' sixth issue.[23]

## D. Negligence/Breach of Fiduciary Duty

### 1. Pleadings

By their thirteenth issue, the Boses argue that the trial court's negligence and breach of fiduciary duty findings are not supported by the pleadings. *See* TEX. R. CIV. P. 301. Specifically, they argue that the trial court dismissed Smith's "negligent undertaking" claims via summary judgment and dismissed all "remaining negligence-based claims" via directed verdict. The Boses further contend that these rulings "included dismissal of any claim for breach of fiduciary duty because [Smith's] allusion to such a theory, though inadequately pleaded, was subsumed in [his] 'negligent undertaking' cause of action.'"

We disagree. The trial court's negligence and breach of fiduciary duty findings were not based on a "negligent undertaking" theory. Instead, the trial court found that, based on the facts and circumstances of the case, the Boses owed duties of care to (1) "place the interests of M.W.F.S. and C.S.S. before their own" and (2) "to protect M.W.F.S. and C.S.S. and to prevent a dangerous person, Trisha, from harming them and others associated with them, including Plaintiffs." Further, we

---

**23.** Because there was legally insufficient evidence to support the proximate causation element of Smith's claim that he was defamed, we need not address the Boses' ninth, tenth, or eleventh issues. *See id.*

do not believe that the trial court ever expressed an intent to "dismiss[ ] all remaining negligence-based claims," as the Boses suggest. `At the conclusion of the presentation of testimony, the Boses moved for directed verdict on Smith's negligent undertaking claim, which was based on the Boses agreeing to monitor M.W.F.S. and C.S.S. under the "child safety plan" between October and December 2008. The trial court granted the Boses' motion.[24] The Boses do not direct us to any point in the record indicating that the trial court intended, by granting the limited motion for directed verdict, to dismiss all of Smith's negligence claims and his breach of fiduciary duty claim.[25] The Boses' thirteenth issue is overruled.

### 2. Limitations

By their fourteenth issue, the Boses contend that Smith's negligence cause of action was barred by limitations. The Boses alleged in a pretrial summary judgment motion that Smith's cause of action for negligent undertaking was untimely because it was based on events that occurred more than two years prior to the filing of Smith's fourth amended petition, which was the first pleading to assert the negligent undertaking claim. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.003(a) (West, Westlaw through 2015 R.S.) (establishing two-year limitations period for personal

injury suits). However, prior to rendering judgment, the trial court granted the Boses' motion for directed verdict as to the negligent undertaking claim, and the final judgment does not find the Boses liable for negligent undertaking.[26] Therefore, we overrule this issue as moot.

### 3. Duty and Breach

By their sixteenth and seventeenth issues, the Boses argue that the evidence was legally and factually insufficient to support the trial court's findings that the Boses owed ordinary and fiduciary duties to M.W.F.S. and C.S.S. and that they breached those duties, respectively. *See Gharda USA, Inc. v. Control Solutions, Inc.*, 464 S.W.3d 338 (Tex.2015) ("The elements of a negligence cause of action are the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach."); *20801, Inc. v. Parker*, 249 S.W.3d 392, 398 (Tex.2008) (quoting *Great Atl. & Pac. Tea Co. v. Evans*, 142 Tex. 1, 175 S.W.2d 249, 250–51 (1943)) (" '[N]egligence' means the doing of that which a person of ordinary prudence would not have done under the same or similar circumstances, or the failure to do that which a person of ordinary prudence would have done under the same or similar circumstances."); *Guevara v. Lackner*, 447 S.W.3d 566, 579 (Tex.App.–Corpus Christi 2014, no pet.) ("The elements of a breach-

---

**24.** As noted, following trial, the trial court orally stated that "I don't believe I can find on a negligent activity" cause of action. However, the written judgment finds the Boses liable on a negligent activity theory, and the written findings control. *See Maeberry v. Gayle*, 955 S.W.2d 875, 878 n. 3 (Tex.App.–Corpus Christi 1997, no pet.) ("The court's written findings of fact control over its oral findings."); *see also In re Doe 10*, 78 S.W.3d 338, 340 (Tex.2002) ("Oral comments from the bench are not written findings of fact.").

**25.** The Boses suggest that the breach of fiduciary duty claims were "inadequately plead-

ed," yet they do not provide argument to support this suggestion. Accordingly, we consider it waived. *See* TEX. R. APP. P. 38.1(i).

**26.** To the extent the Boses now assert that any claims other than the negligent undertaking claim are barred by limitations, they do not direct us to any pleading before the trial court in which they asserted that defense. Accordingly, it is not preserved for review. *See* TEX. R. CIV. P. 94 (providing that limitations is an affirmative defense which must be explicitly pleaded); TEX. R. APP. P. 33.1.

of-fiduciary-duty claim are: (1) a fiduciary relationship between the plaintiff and defendant; (2) a breach of the duty by the defendant; and (3) injury to the plaintiff or benefit to the defendant because of the defendant's breach.").

■ If there is no duty, liability for negligence cannot exist. *Thapar v. Zezulka,* 994 S.W.2d 635, 637 (Tex.1999). Foreseeability of the risk has been called the "foremost and dominant consideration" in the duty analysis. *El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex.1987). The test for foreseeability is what a party should, under the circumstances, reasonably anticipate as a consequence of its conduct. *J.P. Morgan Chase Bank, N.A. v. Tex. Contract Carpet, Inc.,* 302 S.W.3d 515, 533 (Tex.App.–Austin 2009, no pet.) (citing *Foster v. Denton Indep. Sch. Dist.,* 73 S.W.3d 454, 465 (Tex.App.–Fort Worth 2002, no pet.)).

■ Fiduciary duties may arise from certain formal relationships that are considered to be fiduciary as a matter of law or from informal, "confidential" relationships. *Garcia v. Vera,* 342 S.W.3d 721, 724 (Tex.App.–El Paso 2011, no pet.). An informal fiduciary duty may arise from "a moral, social, domestic or purely personal relationship of trust and confidence." *Meyer v. Cathey,* 167 S.W.3d 327, 331 (Tex.2005); *see Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 287 (Tex.1998) ("The law recognizes the existence of confidential relationships in those cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed."))

■ As noted, the trial court found, based on the "facts and circumstances of this case," that the Boses "owed duties of care to place the interests of M.W.F.S. and C.S.S. before their own" and "to protect M.W.F.S. and C.S.S. and prevent a dangerous person, Trisha, from harming them and others associated with them...." These findings are supported by evidence in the record. Ferrell testified that the Boses "had a significant relationship" with M.W.F.S. and C.S.S. and "had been seeing the children routinely probably since birth," including "virtually every weekend" in the period after the SPO became effective "because Trisha was working the graveyard shift." Mary agreed, in her testimony, that she and Larry would often take care of the boys at Trisha's house while Trisha was working. Additionally, after DFPS set up the "child safety plan" which involved supervised visits with Trisha, the Boses agreed to monitor the children as, in the words of Lee, "a neutral ingredient" to ensure there was no improper influence or coaching regarding the abuse allegations. Any reasonable person in the Boses' situation would be able to anticipate that M.W.F.S. and C.S.S. could be greatly harmed by their actions or nonactions under these circumstances. See *J.P. Morgan Chase Bank,* 302 S.W.3d at 533. This evidence shows that a special "relationship of trust and confidence" existed such that the Boses owed ordinary and fiduciary duties of care to the children. *See Meyer,* 167 S.W.3d at 331.

■ The evidence further showed that the Boses did not comply with those duties. They failed to advise authorities of the many warning signs in Trisha's troubled past. In particular, the Boses failed to report certain aspects of Trisha's past with which they were intimately familiar, including: (1) that they had filed suit against Trisha in 2000 to obtain custody of Trisha's older daughter A.B.; (2) that they had custody of A.B. "most of the time" since then; and (3) that they had paid $20,000 on behalf of Trisha to settle a lawsuit in which it was alleged that Trisha made false criminal allegations against an

ex-boyfriend. The Boses additionally failed to advise DFPS or police that Trisha had documented mental health issues, had made multiple threats of suicide, and had been institutionalized in the past. The Boses uncritically propagated Trisha's claims that Smith abused the children, while turning a blind eye to Trisha's own apparent shortcomings as a parent. According to Smith, they were more interested in inducing him to reconcile with Trisha. From all of this evidence, the trial court could have reasonably concluded that the Boses breached the duties they owed to M.W.F.S. and C.S.S. We overrule the Boses' sixteenth and seventeenth issues.

### 4. Causation and Damages

By their eighteenth and nineteenth issues, the Boses contend that there was legally and factually insufficient evidence to support the trial court's finding that the Boses' breach of ordinary and fiduciary duties proximately caused damages to M.W.F.S. and C.S.S.

■ As to causation, Smith contends that, because he did not have access to M.W.F.S. during the time that he was alleged to have been abused, DFPS would have dropped the investigation against him "had the Boses not increased the risk of harm to the boys by failing to disclose key facts to DFPS, making Trisha look credible, and making misrepresentations about Smith." We agree. The evidence showed that, although Trisha was the originator and the driving force behind the false abuse allegations, the Boses—even if they genuinely believed Trisha's allegations—could have likely prevented the harm to M.W.F.S. and C.S.S. if they had informed authorities of what they knew about Trisha at the outset of the investigation. The record supports the trial court's finding that "ensuing events would not have happened or would have been minimized" but for the Boses' actions and inactions. The evidence showed that M.W.F.S. made his first explicit outcry of abuse by Smith immediately after a five-day period—from October 18 to 23, 2008—during which the Boses had exclusive possession of the child. Moreover, it is possible that the parental relationship between Trisha and the children could have been salvaged on a limited basis had the Boses been completely forthcoming with investigators. There was some evidence from which the trial court could have reasonably concluded that the Boses' breach of duties was a proximate cause of the damages suffered by M.W.F.S. and C.S.S. *See Rodriguez–Escobar*, 392 S.W.3d at 113.

■ We further find that the award of damages to M.W.F.S. and C.S.S. was supported by the evidence. The Boses were in a position to stop, or at least minimize, the course of events which eventually led to Trisha voluntarily relinquishing her own parental rights. Ferrell stated that M.W.F.S. and C.S.S. "feel a lot of anger [and] distress" and question why they cannot see their mother. They are underperforming and having discipline problems at school. Smith testified that M.W.F.S. "get[s] angry inappropriately and explosively right off the bat" and he was diagnosed with acute "adjustment disorder with anxiety." Both boys were subject to repeated intrusive SANE exams. We conclude that this evidence supported the trial court's determination that M.W.F.S. suffered $2,500,000 in mental anguish damages and that C.S.S. suffered $1,500,000 in mental anguish damages. *See Figueroa*, 318 S.W.3d at 62 (noting that, given the lack of objective measures, so long as some compensable mental anguish has been established, the task of fixing the exact amount of damages is "generally left to the discretion of the fact finder"). The Boses' eighteenth and nineteenth issues are overruled.

### 5. Comparative Fault

██ By their twenty-first issue, the Boses argue that there was legally and factually insufficient evidence to support the trial court's comparative fault findings regarding the negligence and breach of fiduciary duty claims. Apportionment of responsibility is within the sound discretion of the trier of fact. *Hagins v. E–Z Mart Stores, Inc.*, 128 S.W.3d 383, 392 (Tex.App.–Texarkana 2004, no pet.) (citing *Rosell v. Cent W. Motor Stages, Inc.*, 89 S.W.3d 643, 659–60 (Tex.App.–Dallas 2002, pet. denied) (explaining that section 33.033 of the Texas Civil Practice and Remedies Code affords juries "wide latitude in ... allocating responsibility for an accident")). The Boses argue that "[t]o the extent the boys suffered any compensable harm, the evidence shows overwhelmingly that Trisha caused it, far more than anyone else" and that "there is absolutely no evidence supporting the court's findings that Trisha has merely 10% responsibility because of her 'mental issues,' or that her 'issues' should have been 'well known' to Appellants."

██ Under chapter 33 of the Texas Civil Practice and Remedies Code, the trier of fact must determine, for each cause of action asserted, the percentage of responsibility for each claimant, each defendant, each settling person, and each properly designated responsible third party. Tex. Civ. Prac. & Rem. Code Ann. § 33.003(a) (West, Westlaw through 2015 R.S.). Generally, a liable defendant is liable to a claimant only for the percentage of the damages found by the trier of fact equal to that defendant's percentage of responsibility. *Id.* § 33.013(a) (West, Westlaw through 2015 R.S.). But a liable defendant is jointly and severally liable for all of the damages recoverable by the claimant if the percentage of responsibility attributed to the defendant with respect to

a cause of action is greater than 50 percent. *Id.* § 33.013(b)(1). Here, as noted, the trial court found Mary 51 percent responsible with respect to the breach of fiduciary duty claim, noting that she "had far more contact with Trisha, M.W.F.S. and C.S.S. and has greater fault for failing to place their interests before her own." With respect to the ordinary negligence claim, the trial court found Larry 51 percent responsible "because his interactions with CPS caused severe harm, increased the harm, diminished Craig's ability to protect his children, and promoted Trisha in a time and manner that was critical." As to both the fiduciary duty and ordinary negligence claim, the trial court found Trisha only 10 percent liable, noting that "Trisha is less responsible because she had mental issues which should have been well known to Mary and Larry."

The percentages of responsibility ascribed by the trial court are supported by the evidence. We agree with the trial court's finding that "Trisha's conduct in wrongfully detaining and defaming Plaintiffs is the primary and root cause of damages award in this judgment." Nevertheless, the trial court further found that, even though Trisha's conduct was the "primary and root cause" of the damages suffered by Smith and his children, Trisha's responsibility was diminished due to her "mental issues." This finding was supported by evidence, including Ferrell's testimony that Trisha suffered from anxiety and depression as well as elements of bipolar disorder, borderline personality disorder, and narcissism; evidence establishing that Trisha had been admitted to a psychiatric hospital for inpatient treatment when she was a teenager; and evidence that the Boses were or should have been aware of these facts. It is also notable that, although the statute requires apportionment of responsibility only among those "caus-

ing or contributing to cause in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these," *id.* § 33.003(a), the trial court made no explicit finding that Trisha had breached any applicable legal standard.

The trial court's conclusion as to apportionment of responsibility was not the only conclusion supported by this evidence, and were we to independently review the evidence on a de novo basis, we may not have reached the same conclusion. But our task in evaluating legal sufficiency is not to reassess the credibility of the evidence; instead, it is merely to determine whether any reasonable trier of fact could have rationally made the finding at issue. *See City of Keller*, 168 S.W.3d at 822. Because the evidence meets that standard, we overrule the Boses' twenty-first issue.

### E. Failure to Issue Separate Findings

By three issues, the Boses argue that the trial court erred by failing to make separate findings of fact regarding certain issues under *Crown Life Insurance Co. v. Casteel*, 22 S.W.3d 378 (Tex.2000). Their second issue contends that the trial court erred by failing to issue segregated liability and damage findings "as to each instance or date of interference alleged." Their fifth issue contends that the trial court erred by failing to issue segregated liability and damage findings as to each alleged defamatory statement. Their twentieth issue contends that the trial court erred by failing to issue separate findings as to each element of damages found in favor of M.W.F.S. and C.S.S.

The Texas Supreme Court held in *Casteel* that "when a trial court submits a single broad-form liability question incor-porating multiple theories of liability, the error is harmful and a new trial is required when the appellate court cannot determine whether the jury based its verdict on an improperly submitted invalid theory." *Id.* at 388. Smith argues that *Casteel* is not applicable in bench trials. In any event, assuming but not deciding that *Casteel* applies to bench trials, the trial court's failure to issue additional, more specific findings is not reversible error in this case in light of our disposition of the Boses' other issues. *See id.* The trial court specified, in its findings and conclusions, which damage amounts were attributable to which causes of action; and we have not concluded, in our evaluation of the Boses' other issues, that any particular damage award was based partly on a valid theory and partly on an invalid theory. Therefore, the *Casteel* problem is not present in this case. We overrule the Boses' second, fifth, and twentieth issues.

### IV. CONCLUSION

Because we have found that the claims regarding defamation of J.E.S. and V.A.S. were not supported by the pleadings and the claims regarding defamation of Smith were not supported by legally sufficient evidence, we reverse those portions of the trial court's judgment finding the Boses liable for defamation and assessing damages in connection therewith, and we render judgment that Smith take nothing by way of his defamation claims, either in his individual capacity or as next friend of J.E.S. and V.A.S.

We have also found factually insufficient evidence to support the trial court's award of economic damages under chapter 42 of the family code. We therefore reverse those portions of the trial court's judgment finding the Boses liable and assessing damages under chapter 42 of the family code, and we remand for a new trial on

those claims as to both liability and damages. *See* Tex. R. App. P. 44.1(b)(2). Should Smith, within fifteen days of our judgment, voluntarily remit the $236,000 awarded as economic damages under the family code and notify the Clerk of this Court as such, then the error with respect to the family code claims will be cured and we will supplement this opinion to affirm the trial court's family code liability and mental anguish findings in accordance with the remittitur, thereby obviating the need for a new trial. *See* Tex. R. App. P. 46.5; *Peshak,* 13 S.W.3d at 428.

The remainder of the trial court's judgment is affirmed.

## SUPPLEMENTAL OPINION

This Court, in our opinion dated March 10, 2016, suggested a remittitur of $236,000, representing economic damages awarded to appellee Craig S. Smith, individually and as next friend of his minor children M.W.F.S., C.S.S., J.E.S., and V.A.S., pursuant to Smith's claims under chapter 42 of the family code. We stated that if the remittitur were filed by Smith within fifteen days of the date of the opinion, the error with respect to the family code claims would be cured and we would supplement our opinion to affirm the trial court's family code liability and mental anguish findings in accordance with the remittitur, thereby obviating the need for a new trial. *See* Tex. R. App. P. 46.5; *Military Highway Water Supply Corp. v. Morin,* 114 S.W.3d 728, 741 (Tex.App.–Corpus Christi 2003), as supplemented (Sept. 11, 2003), *rev'd on other grounds,* 156 S.W.3d 569 (Tex.2005).

On March 24, 2016, Smith timely filed his consent to the suggestion of remittitur and asked this Court to modify the trial court's judgment consistent with our opinion and judgment in this matter. Accordingly, we vacate our judgment, but not our opinion, dated March 10, 2016, and modify the trial court's judgment to delete the award of $236,000 in economic damages under the family code. *See* Tex. R. App. P. 46.3. In accordance with our March 10, 2016 opinion, we also reverse those portions of the trial court's judgment finding appellants Larry and Mary Bos liable for defamation and assessing damages in connection therewith, and we render judgment that Smith take nothing by way of his defamation claims, either in his individual capacity or as next friend of J.E.S. and V.A.S. The remainder of the trial court's judgment is affirmed as modified. This Court's opinion of March 10, 2016, otherwise remains in effect.