**Kay Nordt BANKER, Appellant,**

v.

**John BANKER, Appellee.**

**NUMBER 13–15–00385–CV**

Court of Appeals of Texas,
Corpus Christi-Edinburg.

Delivered and filed March 2, 2017

Supplemental Opinion on Rehearing
Overruled April 13, 2017

Randall B. Wilhite, Fullenweider Wilhite, Houston, TX, for Appellant.

Laura Dale, Laura Dale & Associates, P.C., Houston, TX, for Appellee.

Before Chief Justice Valdez and Justices Rodriguez and Benavides

## OPINION

Opinion by Justice Rodriguez

This is an appeal from a divorce decree which divided the marital estate of appellant Kay Nordt Banker and appellee John Banker. By four issues, Kay contests several aspects of the trial court's decree. Kay contends that the trial court abused its discretion in dividing certain estate assets and in rendering an untimely judgment. Kay also contends that the trial court erred in failing to award her pre-judgment interest. We reverse and remand in part, and we affirm in part on condition of remittitur.

## I. BACKGROUND

Kay and John were married in November 1990. They purchased two businesses during the course of the marriage: Banker Crop Insurance Agency, Inc., a business operated by Kay; and El Campo Livestock, Inc. (ECL), a livestock auction house operated by John. Kay filed for divorce in September 2010.

A bench trial was held in April 2013. At trial, the court admitted Kay's testimony, her inventory of estate assets, and most of her exhibits concerning the value of the assets. Kay also offered the testimony of two experts: Jessica Putz, a property-valuation expert, and Stephen Gonsoulin, a business-valuation expert, who primarily testified concerning his appraisal of ECL. Kay's experts proposed to testify on the values of estate assets and also in support of Kay's theory that John had committed fraud on the estate; according to Kay, John had arranged for the sale of a large quantity of cattle through ECL and concealed the proceeds from Kay.

John objected to Gonsoulin and Putz's testimony on various grounds and offered a rebuttal expert. The trial court agreed with John, finding that Kay's experts had relied on several dubious assumptions. The trial court prevented Putz from testifying altogether and later entered findings that Gonsoulin's testimony was neither credible nor valid. Kay does not challenge these rulings on appeal.

In support of his case, John offered several exhibits and his own testimony on the value of the estate's assets. However, the trial court did not admit the majority of John's exhibits, including John's sworn inventory.

After the April 2013 trial, the court deferred judgment and ordered John and Kay to attend mediation, which ultimately proved unsuccessful. On April 17, 2014, the trial court circulated a non-final draft of its divorce decree by letter to the parties. On April 28, 2014, Kay filed a motion to reconsider the draft decree and a motion to divide the community estate property.

On July 13, 2014, the trial court entered a decree of divorce with a division of property. The decree listed the reason for divorce as adultery by John. As relevant to this appeal, the decree awarded John sole ownership of ECL, multiple vehicles and trailers which were titled in John's name, and all "goods ... in the possession of the husband or subject to his sole control."

The decree awarded Kay sole ownership of Banker Crop Insurance and a bank account with First Victoria Bank, among other things. Ultimately, the trial court divided the estate 55% to Kay and 45% to John. To achieve this division, the trial court entered an offsetting judgment and lien of $455,133 against John, payable to Kay.

On July 28, 2014, Kay filed a request for findings of fact and conclusions of law. On August 12, Kay filed a motion for new trial and a motion to modify the judgment. On August 26, Kay filed a notice of past-due findings. On September 15, Kay filed her second amended petition for divorce as well as a motion for leave to file the petition. In her second amended petition, Kay pleaded for pre-judgment interest for the first time. On September 25, the trial court entered an order granting Kay's motion to modify and vacating the original decree pending the entry of a modified decree. On October 30, Kay filed an amended motion for leave to file her second amended petition, a motion for judgment, and a notice of appeal. On January 28, 2015, the trial court granted Kay's motion to modify the judgment. Among other things, the trial court indicated that it would increase the offsetting judgment against John from $455,133 to $676,733.

On March 27, John filed a motion to modify, primarily seeking a reduction of the offsetting judgment to $573.643.91. On May 11, the trial court denied John's motion and entered its modified final decree of divorce. The decree included the $676,733 offsetting judgment lien in favor of Kay, but excluded pre-judgment interest.

On May 12, Kay again requested findings of fact and conclusions of law, and on June 9, Kay again moved for a new trial. Kay filed this appeal on August 6, 2015.

On appeal, we remanded the matter to the trial court for the entry of findings of fact and conclusions of law. The trial court entered findings and conclusions on December 10, 2015. Among its findings, the trial court rejected Kay's fraud theory and the evidence which supported it. The trial court also concluded that the judgment should be modified to grant Kay pre-judgment interest on the offsetting judgment. However, the trial court did not modify the judgment to grant Kay pre-judgment interest.

On appeal, Kay presents four issues. By her first and third issues, Kay argues that the trial court erred in valuing and distributing certain community assets. By her second issue, Kay argues that the trial court erred in delaying the rendition of judgment for two years and rendering judgment based on outdated evidence of property values. Also within her second issue, Kay argues that the trial court erred in failing to grant a new trial to receive updated evidence. By a fourth issue, Kay argues that the trial court erred in failing to grant her pre-judgment interest.

## II. Standard of Review and General Applicable Law

■■■ We review the trial court's division of property to determine whether the trial court abused its discretion by making a division that was manifestly unjust and unfair. *Vandiver v. Vandiver*, 4 S.W.3d 300, 303 (Tex. App.–Corpus Christi 1999, pet. denied). A trial court has wide discretion in making a just and right division. *Handley v. Handley*, 122 S.W.3d 904, 907 (Tex. App.–Corpus Christi 2003, no pet.). In an abuse of discretion analysis, legal and factual sufficiency are not independent grounds of error, but rather relevant factors in assessing whether the trial court abused its discretion. *Id.* There is generally no abuse of discretion on grounds of insufficiency if some probative evidence supports the trial court's findings. *In re*

*Barber,* 982 S.W.2d 364, 366 (Tex. 1998) (orig. proceeding). We presume on appeal that the trial court correctly exercised its discretion when dividing the fruits of a marriage, and the appellant bears the burden to show from the record that the division was so disproportionate, and thus unfair, that it constitutes an abuse of discretion. *O'Carolan v. Hopper,* 414 S.W.3d 288, 311 (Tex. App.–Austin 2013, no pet.); *see Saldana v. Saldana,* 791 S.W.2d 316, 319 (Tex. App.–Corpus Christi 1990, no writ). As the finder of fact for the proceeding, the trial court is the exclusive judge of the credibility of the witnesses, the weight to be given their testimony, and the best means to resolve inconsistencies in the evidence. *Bos v. Smith,* 492 S.W.3d 361, 381 (Tex. App.–Corpus Christi 2016, pet. filed); *Handley,* 122 S.W.3d at 911.

 We may review a trial court's conclusions of law de novo to determine their correctness. *City of Austin v. Whittington,* 384 S.W.3d 766, 779 n.10 (Tex. 2012) (citing *BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex. 2002)). But we will not reverse an erroneous conclusion if the trial court rendered the proper judgment. *Id.* Regardless of the label, the trial court's designation of a finding of fact or conclusion of law is not controlling on appeal. *Ray v. Farmers' State Bank of Hart,* 576 S.W.2d 607, 608 n.1 (Tex. 1979). Conclusions which are actually findings will be treated as findings, and vice versa. *See Smith v. Smith,* 112 S.W.3d 275, 279 (Tex. App.–Corpus Christi 2003, pet. denied).

 In a decree of divorce or annulment, the court shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage. TEX. FAM. CODE ANN. § 7.001 (West, Westlaw through 2015 R.S.). The value of community assets is generally determined at the date of divorce. *Handley,* 122 S.W.3d at 908; *O'Carolan,* 414 S.W.3d at 312. In valuing assets in the estate, if several values are given, or if a witness testifies that the value may be higher or lower than his estimate, the court's determination of the value should be within the ranges in the evidence. *Van Heerden v. Van Heerden,* 321 S.W.3d 869, 880 (Tex. App.–Houston [14th Dist.] 2010, no pet.); *Mata v. Mata,* 710 S.W.2d 756, 758 (Tex. App.–Corpus Christi 1986, no writ). Where the uncontested evidence establishes only one value, the trial court cannot draw a different inference. *Mata,* 710 S.W.2d at 758; *see also Cruz v. Cruz,* No. 13–04–00540–CV, 2006 WL 2371342, at *3 (Tex. App.–Corpus Christi Aug. 17, 2006, no pet.) (mem. op.).

## III. VALUATION OF SPECIFIC ASSETS

By her first issue, Kay contends that the trial court incorrectly assessed the value of three groups of assets which were awarded to John: ECL itself, ECL's business good will, and multiple vehicles. Kay also urges error in the trial court's appraisal of two bank accounts which were awarded to her. According to Kay, these values were either unsupported by or directly contrary to the available evidence, they rendered the overall division manifestly unjust, and therefore constituted an abuse of discretion.

### A. Valuation of ECL

The trial court found that ECL had a fair market value of $1,446,489.09 under an "asset-based approach" to business valuation. Kay asserts that the trial court did not admit any probative evidence to support this valuation; she claims that this figure was instead derived from John's inventory, which was not admitted into evidence. Kay further contends that the only record evidence of ECL's value is what she describes as her expert's own

asset-based valuation of ECL at $1,680,000.

In response, John insists that his own testimony on the value of ECL supports the trial court's finding and judgment. John primarily relies on the "property-owner rule," arguing that this rule entitled him to testify to the value of the business.

## 1. Applicable Law

■■■ An inventory and appraisement that has not been admitted into evidence is more like a party's pleading. *Barnard v. Barnard*, 133 S.W.3d 782, 789 (Tex. App.–Fort Worth 2004, pet. denied); *see Tschirhart v. Tschirhart*, 876 S.W.2d 507, 509 (Tex. App.–Austin 1994, no writ). Unless a party's inventory and appraisal has been admitted into evidence, it may not be considered as evidence of a property's characterization of value. *Barnard*, 133 S.W.3d at 789.

■■■ A property's market value is "the price the property will bring when offered for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but is under no necessity of buying." *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001). Under the property-owner rule, an owner is qualified to testify to the market value of his property even if he is not an expert. *Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 852–53 (Tex. 2011). This rule is based "on the presumption that an owner is familiar with his property and its value," and it "is an exception to the requirement that a witness must otherwise establish his qualifications to express an opinion on [property] values." *Natural Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 157 (Tex. 2012). "The owner of a business is likewise permitted to testify as to its value, if he has a basis of knowledge of the value of the business." *Sharifi v.*

*Steen Auto., L.L.C.*, 370 S.W.3d 126, 150 (Tex. App.–Dallas 2012, no pet.) (quoting *Ramex Constr. Co. v. Tamcon Servs., Inc.*, 29 S.W.3d 135, 138 (Tex. App.–Houston [14th Dist.] 2000, no pet.)); *see Laprade v. Laprade*, 784 S.W.2d 490, 492 (Tex. App.–Fort Worth 1990, writ denied). But the property-owner rule has limits. *See Natural Gas Pipeline*, 397 S.W.3d at 158–59. To testify on valuation, the owner:

> must provide the factual basis on which his opinion rests. This burden is not onerous, particularly in light of the resources available today. Evidence of price paid, nearby sales, tax valuations, appraisals, online resources, and any other relevant factors may be offered to support the claim. But the valuation must be substantiated; a naked assertion of "market value" is not enough.

*Id.* at 159.

## 2. Application

■■■ In his inventory, John stated that the value of ECL was $1,439,412. John's primary evidence to support this valuation was his own testimony under the property-owner rule. *See Sharifi*, 370 S.W.3d at 150. We therefore evaluate whether John adequately laid out his "basis of knowledge of the value of the business" to satisfy the limitations on the property-owner rule. *See id.*; *see also Natural Gas Pipeline*, 397 S.W.3d at 159.

John provided support for his personal knowledge of ECL's value, which was the basis of his pleaded valuation. *See Handley*, 122 S.W.3d at 908 (holding that although wife's inventory was never offered into evidence, trial court could base its valuation on wife's testimony of her personal knowledge of the value of marital property). By way of background, John testified that he had worked in cattle auction houses since he was eighteen, including while he studied agriculture at two

Texas universities. According to John, he oversaw most aspects of ECL's operation, including the management of livestock before and after auctions, soliciting business and planning the auctions, and maintaining the company's equipment. He explained his knowledge of ECL's sources of income and liabilities; according to John, the company's income primarily consisted of commissions on the sale of auctioned livestock, minus per-head fees from the Texas Beef Board and the Texas Southwest Cattle Raising Association. John testified that ECL also charged fees for services rendered to livestock—watering, feeding, hauling, veterinary care, etc.—but that these services were usually charged at cost or less than cost in order to obtain customers. He likewise demonstrated his knowledge of the competitive pricing in the local market of southeast Texas, with rival auction houses in Wharton, Edna, Columbus, and Hallettsville. John further testified that he spoke two to three times per year with Gary Pedlar, who handled ECL's finances and tax reporting. John explained his understanding, based on his experience in selling another small business before the divorce, that a simple rule of thumb for determining the value of a business was to multiply the yearly income of the business by 4.5. Finally, John testified that he considered himself one and the same with ECL from the perspectives of ownership and finance and that, since his separation from Kay, he had taken up residence at the ECL facility.

As for the estimate itself, John testified that he took several factors into account in reaching his estimate that ECL was worth $1,439,412. John explained that he factored in the $1,384,000 that he and Kay paid for ECL, the outstanding debt of $651,510 from this purchase, a tax roll appraisal of the business, the depreciation and maintenance cost of ECL's sixty-year-old facility, the value of the underlying land and all structures and improvements on it, the business's "annual sales versus what they were when" he and Kay purchased ECL, and his assumption that the value of the real estate had appreciated since that purchase.

On the other hand, Kay points to many deficiencies in John's explanation of his estimate. Among them, John never described his estimate as a "fair market value" for ECL, but instead simply described his estimate was "what I think was a fair value." For another, John admitted that he did not handle the business's book-keeping. Instead, this role was filled by Kay, John's mother, and another ECL employee at various points during the marriage. Similarly, John's testimony demonstrated a lack of awareness of many categories of business expenses and values. John only assumed that the value of the real estate had appreciated since purchasing it, and he admitted that his estimate of the real estate's value was based on his general sense of "today's market." When John was pressed during cross-examination, he stated that he did not remember how multiple aspects of his estimate were calculated. Finally, to the extent that John claimed to have considered the growth in ECL's annual sales, Kay argued that this was incompatible with the trial court's findings, which opted for an "asset-based approach" to business valuation.

We find both sides' briefing on this issue to be compelling. Nonetheless, we are of the opinion that John demonstrated a minimum basis of personal knowledge adequate to invoke the property-owner rule. *See Sharifi*, 370 S.W.3d at 150; *see also Natural Gas Pipeline*, 397 S.W.3d at 159. John testified that he took account of several relevant factors in reaching his estimate, and he did so based on his personal knowledge from a decade of ownership and a lifetime of experience and education in

the livestock auction market. Kay drew out many inconsistencies in this testimony, but it was the trial court's right and role to resolve these inconsistencies. *See Bos,* 492 S.W.3d at 381. The trial court resolved them in John's favor, and we defer to this resolution on appeal. *See id.* As to Kay's point that John only described his estimate as a "fair" value, the "magic words 'fair market value' are not required." *Adams v. State Farm Mut. Auto. Ins. Co.,* 264 S.W.3d 424, 428 (Tex. App.–Dallas 2008, pet. denied) (op. on reh'g). Thus, the trial court's valuation of ECL was supported by at least some probative and substantive evidence in the form of John's testimony as the business-owner, and we find no abuse of discretion in this valuation. *See Barber,* 982 S.W.2d at 366.

## B. ECL's Good Will Value

■ Kay next argues that the trial court incorrectly rejected her evidence of the value of ECL's good will and effectively found that this good will had no value. To address her claim, the trial court entered a finding that "Good will, discount rates, and capitalization are not factors for consideration when valuing a business based on the asset approach." We construe this entry as a conclusion of law, *see Smith,* 112 S.W.3d at 279, since it does not determine the facts of the case, but instead sets out a general "principle of law." [1] *See Pac. Emp'rs Ins. Co. v. Brown,* 86 S.W.3d 353, 357 (Tex. App.–Texarkana 2002, no pet.). We therefore review this conclusion de novo. *See Whittington,* 384 S.W.3d at 779 n.10.

■ On this point, we agree with Kay that good will is an asset which may be subject to appraisal and division in a divorce proceeding. "Texas law has long rec-

ognized that [good will], although intangible, is property and is an integral part of the business just as its physical assets are." *Marsh USA Inc. v. Cook,* 354 S.W.3d 764, 777 (Tex. 2011); *see Von Hohn v. Von Hohn,* 260 S.W.3d 631, 638 (Tex. App.–Tyler 2008, no pet.) (setting out a test to determine whether a spouse-owned business's good will is a community asset subject to division upon divorce). Thus, good will is not categorically unavailable for purposes of a just and right division. *See* TEX. FAM. CODE ANN. § 7.001.

However, we will not reverse the judgment on the basis of an erroneous conclusion where the trial court rendered the proper judgment. *See Whittington,* 384 S.W.3d at 779 n.10. The question remains whether other considerations justified the trial court's decision. We conclude that they do. As John points out, the trial court effectively rejected the only evidence supporting the existence or value of ECL's good will: the testimony of Kay's business-valuation expert, Stephen Gonsoulin. At trial, Gonsoulin testified that under the income-based approach to valuation, the discounted value of ECL's projected income was $2,036,000. Gonsoulin then explained that his approach was based on numerous assumptions, many of which were challenged by John as baseless. The trial court agreed with John, and it entered several findings of fact detailing the reasons why it rejected Gonsoulin's testimony.

■ Gonsoulin also estimated that ECL's good will value was $356,000. However, this estimate was deduced from and entirely based upon Gonsoulin's discredited, income-based valuation of ECL; Gonsoulin reached the figure of $356,000 by

---

1. As the trial court stated in its findings and conclusions: "If any statement in this document listed as a finding of fact is actually a conclusion of law, it will be considered as a conclusion of law," and vice versa.

subtracting $1,680,000, his value for ECL's real estate, from his estimate that ECL was worth $2,036,000, based on its income. The trial court expressly rejected Kay's income-based valuation, which was the predicate for Kay's expert evidence on ECL's good will. Kay presented no other evidence concerning ECL's good will, and thus she effectively left this claim unsupported by any valid evidence.[2] Given that no valid evidence supported the existence or value of ECL's good will, we conclude that Kay failed to carry her appellate burden to demonstrate that the trial court abused its discretion in declining to value and divide ECL's good will as a community asset. *See O'Carolan*, 414 S.W.3d at 311; *Saldana*, 791 S.W.2d at 319.

## C. Value of Vehicles

■ Kay next contends that the trial court undervalued some of the vehicles awarded to John as his separate property. In its findings, the trial court assessed the combined value of the twelve vehicles awarded to John as $118,510.91. Kay focuses on five of these vehicles, and she contends that the only relevant evidence in the record establishes that the market value of these five vehicles was $178,000. This value was derived from the opinion of Putz, Kay's property-valuation expert, who opined that the 2012 Peterbilt tractor was worth $126,000, the two pickups were worth $22,000 and $19,000 respectively, and the two trailers were worth $7,000 and $4,000 respectively.

There are multiple problems with Kay's argument. First, the trial court expressly excluded Putz's proposed testimony because it relied on potentially faulty assumptions about the vehicles. For instance,

Putz admitted at trial that she had not personally inspected all of the vehicles, but had instead based her estimate on her own assumptions about the condition and depreciation of the vehicles.

Second, even assuming Putz's testimony was valid, the trial court would have had the discretion to assign the vehicles any value between Putz's value of $178,000 and John's estimate of $74,811. John supported his estimate with testimony explaining how he appraised the twelve vehicles. John testified that he allowed his customers to use ECL's property to sell their trucks and trailers to other customers, and he had thus generally developed a good feel for values on the local market. As to his specific vehicles, he explained that he used the vehicles on a daily basis, and he developed his estimate by comparing his personal knowledge of the vehicles' condition, mileage, age, and capabilities with the blue book values for similar vehicles, reduced by depreciation and the remaining debt owed on the purchase price. Because the trial court's value of $118,510.91 was between Kay's value of $178,000 and John's appraisal of $74,811, it would not have been an abuse of discretion.

Third, as John points out, even if we found his appraisal-testimony to be inadequate, it was nonetheless Kay's burden as the appealing party to demonstrate that the trial court abused its discretion based on the evidence in the record. Kay failed to carry this burden. Kay does not contest the trial court's decision to exclude Putz's testimony, and she did not provide the trial court with any other acceptable evidence of the vehicles' value. She therefore "cannot now complain of the court's lack of complete information." *See LeBlanc v. Le-*

---

2. In this sense, Kay's claim for good will was addressed elsewhere in the findings and conclusions, where the trial court determined that "[a]ll other relief requested by either party is denied as being not supported by the facts admitted into evidence at trial and applicable law."

*Blanc*, 761 S.W.2d 450, 453 (Tex. App.–Corpus Christi 1988), *writ denied*, 778 S.W.2d 865, 865 (Tex. 1989); *see also Wallace v. Wallace*, 623 S.W.2d 723, 725 (Tex. Civ. App.–Houston [1st Dist.] 1981, writ dism'd). Kay has thus failed to demonstrate that the trial court abused its discretion in finding the value of all twelve vehicles to be $118,510.91. *See Saldana*, 791 S.W.2d at 319; *LeBlanc*, 761 S.W.2d at 453.

### D. Bank Accounts

■ Kay next argues that the trial court abused its discretion by overvaluing two bank accounts awarded to her, one with First Victoria Bank and another with Vista Bank. The trial court found that these accounts had a combined value of $44,133. This figure coincides with the value stated in John's inventory, which was not admitted. According to Kay, there was no record evidence to support this figure, and the trial court therefore abused its discretion by incorporating this figure into its findings.

The record reveals five pieces of evidence bearing on these bank accounts. First, Kay testified that she sold a portion of her insurance business in 2008 for $500,000 and deposited that check into the Vista account. Second, John testified that as of the couple's separation in October of 2010, the Vista account contained $32,000. John testified at trial that he had not made any draws on this account after the separation. Third, Kay testified that after she filed for divorce in September of 2010, she used the remaining funds in the Vista account to pay her attorneys in the divorce proceedings. Fourth, Kay produced a bank statement showing that the First Victoria account contained only $1,212 as of September 2012. Kay produced no statements for the Vista account from the same period of time. Fifth, Kay's inventory, which was admitted into evidence, stated that the value of the First Victoria account was $1,212 and did not provide a value for the Vista account.

■ Based on this evidence, John contends that the trial court could, in its discretion, assess the value of the accounts at any figure between $500,000 (the accounts' minimum value in 2008) and $1,212 (their value in September 2012). We disagree. John would set the upper range of discretion at $500,000, but this figure applied only in 2008—five years before trial and seven years before the final modified decree of divorce. Generally, the value of community assets and liabilities is determined at the date of divorce or as close to it as possible. *Handley*, 122 S.W.3d at 908; *see also Hernandez v. Hernandez*, No. 13–08–00722–CV, 2010 WL 3820900, at *5 (Tex. App.–Corpus Christi Sept. 30, 2010, pet. denied) (mem. op.) (rejecting a spouse's attempt to show an asset's value based on an account statement created four years before trial). Moreover, Kay testified that between the 2008 deposit of $500,000 and the 2010 divorce filing, she spent large portions of this sum on ECL, a business which undisputedly was community property and which was John's primary occupation. *See Pelzig v. Berkebile*, 931 S.W.2d 398, 401 (Tex. App.–Corpus Christi 1996, no writ) (discussing the equitable difference between a spouse's expense of community funds to benefit his own separate estate compared with expenses benefiting the community). In light of this great remove in time and the undisputed testimony that these funds were largely spent for the benefit of the community (and the benefit of John in particular), this $500,000 threshold could not serve as the upper limit of discretion. None of the evidence in the record supports the trial court's valuation of the bank accounts as $44,133.

■ However, the evidence does support a lesser amount. The evidence shows that the bank accounts contained $33,212 in community property on September 2010, the date the petition for divorce was filed, and that Kay alone spent these funds on her attorney's fees for the divorce proceedings. "Prior payments out of the community estate to attorneys in the divorce action are . . . to be taken into account in the division of the marital estate." *Grossnickle v. Grossnickle*, 935 S.W.2d 830, 847 (Tex. App.–Texarkana 1996, writ denied); *see also Tucker v. Tucker*, No. 13–11–00056–CV, 2013 WL 268937, at *11 (Tex. App.–Corpus Christi Jan. 24, 2013, pet. denied) (mem. op.) (same, noting that a "trial court has broad discretion in how it considers a party's payment of attorney fees from the community estate pending divorce"); *Gaides v. Gaides*, No. 14–99–00172–CV, 2001 WL 460049, at *3 (Tex. App.–Houston [14th Dist.] May 3, 2001, pet. denied) (op.). Thus, "competent evidence exists to establish *some* reasonably certain amount . . . just not the particular amount awarded by the trial court." *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 880 (Tex. 2010) (emphasis in original).

Following the guidance of *Swinnea*, we suggest a remittitur in favor of Kay. *See id.*; *Thomas v. Thomas*, 603 S.W.2d 356, 358–59 (Tex. Civ. App.–Houston [14th Dist.] 1980, writ dism'd) (affirming a property division on condition of remittitur: trial court had factored a wife's expenses on attorney's fees into its equitable division, but the evidence only supported a lesser sum than that awarded by the trial court). The difference between the trial court's finding of $44,133 and the support-able figure of $33,212 is $10,921. The trial court further found that Kay was entitled to an unequal distribution of 55% of the marital estate. Accordingly, we suggest remittitur in the amount of $4,914 in favor of Kay, which represents the amount which the trial court overvalued Kay's 55% share of the total marital estate.[3] Should John voluntarily remit the $4,914 which was erroneously credited to him within fifteen days of our judgment, any reversible error will be cured. *See* Tex. R. App. P. 46.5.

## E. Result of Erroneous Valuations

■ Kay contends that each of the miscalculations described above—i.e., in the values for ECL, its good will, the vehicles, and the bank accounts—contributed to an overall division that was manifestly unjust and unfair. However, Kay's argument is predicated on the idea that each of these alleged miscalculations was so serious as to amount to an abuse of discretion. We have concluded that all but one of these rulings was within the trial court's discretion and that the one unsupported ruling was only $10,921 removed from the proper range of values. *See Van Heerden*, 321 S.W.3d at 880; *Mata*, 710 S.W.2d at 758. Comparing $10,921 to the total estate value of $2,096,665 as assessed by the trial court, we cannot agree with Kay that the overall division was manifestly unjust and unfair. *See Vandiver*, 4 S.W.3d at 303.

## F. Conclusion

Pending John's acceptance of remittitur in the amount of $4,914, we conditionally overrule that aspect of Kay's first issue dealing with the disputed bank accounts.

3. $2,096,665 minus the overvaluation of $10,921 is $2,085,744. Kay would be entitled to 55%, or $1,147,159, of this $2,085,744, and John would be entitled to 45%, or $938,584.80. Instead, Kay received $1,142,245, and John received $943,499. The difference between the $1,147,159 which Kay was entitled to receive and the $1,142,245 which Kay actually received, once the overvaluation is corrected, is $4,914.

We overrule Kay's first issue in all other respects.

## IV. TIME DIFFERENCE

 By her second issue, Kay raises multiple complaints regarding the delay between the time of trial in April 2013 and the entry of judgment in May 2015, and the denial of her motion for new trial following the judgment. Each of Kay's arguments relates to her contention that the value of the marital estate assets changed dramatically in the intervening two years, and we address them together. Kay asserts that the trial court abused its discretion in failing to timely render its judgment. As we understand her argument, Kay also contends that the trial court erred in denying her motion for new trial and instead retaining a judgment based on outdated evidence of asset value.

 A party seeking a new trial on grounds of newly-discovered evidence must demonstrate to the trial court that (1) the evidence has come to its knowledge since the trial, (2) its failure to discover the evidence sooner was not due to lack of diligence, (3) the evidence is not cumulative, and (4) the evidence is so material it would probably produce a different result if a new trial were granted. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010). Denial of a motion for new trial is reviewed for abuse of discretion. *Id.*

We find Kay's complaints unavailing for several reasons. First, Kay cites no law, and we find little authority, to support her contention that the trial court abused its discretion in failing to timely render its judgment. *See, e.g., Cabelka v. Schmaltz*, No. 02–13–00143–CV, 2014 WL 2144182, at *1 (Tex. App.–Fort Worth May 22, 2014, no pet.) (mem. op.) ("Cabelka candidly acknowledges in his brief that the only authority he could find on the question of how long a trial court may take to render a judgment is a canon of the code of judicial conduct stating that 'a judge should dispose of all judicial matters promptly, efficiently, and fairly.' " (editorial marks omitted)); *LeBlanc v. Estate of Gassner*, No. 01–94–00511–CV, 1995 WL 569673, at *14 (Tex. App.–Houston [1st Dist.] Sept. 28, 1995, no writ) (op.) ("Moreover, the plaintiffs do not cite any authority that a delay between trial and the rendering of judgment is an abuse of discretion."). In contrast, it has been widely held that every trial court has "the 'inherent power' to control the disposition of the cases on its docket 'with economy of time and effort for itself, for counsel, and for litigants.' " *Metzger v. Sebek*, 892 S.W.2d 20, 38 (Tex. App.–Houston [1st Dist.] 1994, writ denied) (quoting, with some license, from *Landis v. N. Am. Co.*, 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936)).

Second, our sister courts have held that even assuming that there is some implied limitation on the interval in which a trial court may consider its judgment, it would be the moving party's burden to establish that the post-trial delay was unreasonable and caused harm. *See Lloyd's of London v. Walker*, 716 S.W.2d 99, 101 (Tex. App.–Dallas 1986, writ ref'd n.r.e.); *Bryant v. Bruner*, 593 S.W.2d 358, 362 (Tex. Civ. App.–Texarkana 1979, no writ); *see also Cabelka*, 2014 WL 2144182, at *1; *Smith v. Montemayor*, No. 03–02–00466–CV, 2003 WL 21401591, at *10 (Tex. App.–Austin June 19, 2003, no pet.) (mem. op.). As to whether the delay is unreasonable, courts have placed particular emphasis on whether the actions or inactions of the movant contributed to the delay. *See McCray v. Glass*, 96 S.W.3d 690, 692 (Tex. App.–Beaumont 2003, no pet.) (per curiam); *see also Cabelka*, 2014 WL 2144182, at *1. Here, much of the delay can be traced to Kay's extensive post-trial motion practice. Moreover, Kay obtained most of

the relief requested in her motions, including a modification which increased the amount of the offsetting judgment against John from $455,133 to $676,733, and a conclusion that she should be awarded pre-judgment interest on this judgment. In light of Kay's role in creating the delay and the satisfaction she obtained from it, she cannot now be heard to complain that any delay was unreasonable. *See Walker*, 716 S.W.2d at 101.

Third, Kay's evidence of changing property values does little to convince us that the trial court's findings were "manifestly unjust and unfair," because the delay itself had no effect on property values. *See Vandiver*, 4 S.W.3d at 303. If the trial court had promptly entered judgment following trial in 2013, these property values presumably would have changed just the same, and Kay's estate would be in the exact same position regardless of the delay in rendering judgment. In this sense, we fail to see how any harm causally resulted from the delay. *See Walker*, 716 S.W.2d at 101.

Fourth, the basis of Kay's motion for new trial was "newly discovered evidence." However, the basis might better be termed "new evidence," given that this evidence was created by developments after trial. On this point, our sister courts have categorically held that evidence not in existence prior to judgment cannot support a new trial. *See In re S.M.V.*, 287 S.W.3d 435, 452 (Tex. App.–Dallas 2009, no pet.); *Beneficial Pers. Servs. of Tex., Inc. v. Rey*, 927 S.W.2d 157, 176 (Tex. App.–El Paso 1996), *vacated pursuant to settlement*, 938 S.W.2d 717 (Tex. 1997); *see also Langan v. Langan*, No. 14–12–01134–CV, 2014 WL 3051216, at *11–12 (Tex. App.–Houston [14th Dist.] July 3, 2014, no pet.) (mem. op.). However, we need not adopt this rule to address the matter at hand.

Instead, we rely on the well-established rule that a party seeking a new trial must show that the newly-discovered evidence is not cumulative. *See Waffle House*, 313 S.W.3d at 813. Here, all of Kay's evidence concerning the value of the community assets as of 2015 was simply cumulative of the parties' forward-looking evidence at trial, which projected the future income and usefulness of the estate assets. *See id.* For instance, Kay's expert Stephen Gonsoulin offered a sophisticated estimate of the value of ECL based upon its projected future income. Gonsoulin was allowed to fully develop his projections in voir dire—e.g., how he projected out the effect of trends in ECL's business practices, the future prospects of the live stock market, the systemic risk of future regulation from the USDA—but the trial court found his prediction of future income to be overly optimistic and unreliable, given that it was based on only one year of financial data showing that ECL was profitable, compared to four years showing it was not. For another, Kay's property-valuation expert Jessica Putz estimated that the present value of the five vehicles was $178,000. However, the trial court found this estimate of value inadmissible because it was based on Putz's untested assumptions about the vehicles' good condition and low depreciation—that is, she unrealistically assumed that the assets had a greater future usefulness and thus a far greater present value than what was actually supported by the evidence.

Kay's argument is similar to one advanced by the defendant in *Missouri Pacific Railroad Company v. Hesse*, 417 S.W.2d 379, 380 (Tex. Civ. App.–San Antonio 1967, writ ref'd n.r.e.). There, a jury returned a verdict in favor of Hesse, a railroad employee, finding that his physical capabilities and earning capacity had been mostly destroyed by an accident which crushed his lower body. *Id.* The

jury awarded Hesse $76,040 for future pain, future impairment, and future medical expenses, among other things. *Id.* Shortly thereafter, the railroad moved for new trial on the basis of newly discovered evidence relating to Hesse's future capabilities: after trial, Hesse had briefly returned to work for the railroad. *Id.* The trial court denied the motion, and the court of appeals affirmed. *Id.* at 383. The *Hesse* court reasoned that both sides had extensively developed "medical testimony about the future disabling effect of plaintiff's injuries" and that "the evidence relating to post-trial events in this case 'was not dissimilar to that used upon the trial and was additional evidence of the same kind to the same point' as that introduced at the trial." *Id.* at 381 (quoting *New Amsterdam Cas. Co. v. Jordan*, 359 S.W.2d 864, 867 (Tex. 1962)). "[T]he permanency of plaintiff's injuries, their extent and severity, and whether he could ever return to his former railroad switching employment were all issues of the evidence." *Id.* at 382 (quoting *New Amsterdam Cas.*, 359 S.W.2d at 867). "Under these circumstances, the evidence relied on by defendant cannot be said to be of such probative force as to justify the conclusion that defendant has not had its day in court." *Id.*

Like the parties debating the present value of future debilitation in *Hesse*, here, Kay had the opportunity to fully develop her forward-looking evidence, which estimated the present value of the assets based on their projected future income and utility. *See id.* As in *Hesse*, we conclude that Kay's evidence of post-trial events was cumulative of her well-developed projections at trial. *See id.*; *see also Rathmell v. Morrison*, 732 S.W.2d 6, 19 (Tex. App.–Houston [14th Dist.] 1987, no writ) ("There was evidence that the two years between the divorce and sale of the companies saw many changes in personnel and profitability of the companies, but this would go to the weight, not the admissibility, of the evidence.").

■■■ Thus Kay failed to establish all elements of her burden for a new trial, *see Waffle House*, 313 S.W.3d at 813, and failed to demonstrate any unreasonableness or harm in the delay following her original trial. *See Walker*, 716 S.W.2d at 101. We cannot say that the trial court acted in a manner that was "manifestly unjust and unfair." *See Vandiver*, 4 S.W.3d at 303. Rather, we are of the opinion that the trial court justly exercised both its discretion in denying a new trial, *see Waffle House*, 313 S.W.3d at 813, and its "inherent power to control the disposition of the cases on its docket." *See Metzger*, 892 S.W.2d at 38.[4] We overrule Kay's second issue.

## V. LIVESTOCK

■■■ By her third issue, Kay argues that the trial court abused its discretion in failing to divide certain community assets. First, Kay asserts that the trial court

---

4. In a footnote to her second issue, Kay contends that the trial court erred in excluding certain evidence that she offered at the hearing on her second motion for new trial. Kay sought to prove the amount of attorney's fees that she expended on her post-trial efforts—which she claims was over $120,000—and she asked the trial court to credit her for these expenses in its division. The trial court declined to do so and excluded her evidence. "The court's failure to give credit specifically to either party for expenditures of community funds on the divorce was not an abuse of discretion." *Grossnickle v. Grossnickle*, 935 S.W.2d 830, 847 (Tex. App.–Texarkana 1996, writ denied); *see also Markowitz v. Markowitz*, 118 S.W.3d 82, 91 (Tex. App.–Houston [14th Dist.] 2003, pet. denied) (op. on reh'g) (upholding jury determination which credited wife for $100,000 of community assets which husband spent on divorce proceedings). We thus find Kay's argument to be without merit.

failed to account for a sum of $90,500 in its division of property, which Kay contends were the proceeds from John's secret sale of livestock.

We disagree. The trial court expressly found that Kay's evidence of secret sales was not credible. The trial court instead believed John's evidence offering an explanation for the alleged irregularities in ECL's accounting data. As the exclusive judge of the credibility of the evidence, the trial court did not abuse its discretion by resolving the conflicting evidence in John's favor. *See Bos*, 492 S.W.3d at 381; *Handley*, 122 S.W.3d at 911. We overrule this aspect of Kay's third issue.

Second, Kay argues the trial court's division did not account for six horses which were in John's possession. At trial, both John and Kay acknowledged the existence of these horses in their testimony. However, John argues that these horses were actually accounted for in the divorce decree. John cites a passage from the decree which states that John was awarded all "household ... goods" then in his possession. John cites the rule that a horse is a tangible good. *Archibald v. Act III Arabians*, 755 S.W.2d 84, 86 (Tex. 1988). John reasons that the horses were justly awarded to him as goods and that no remand is necessary for the trial court to address the division of the horses.

John's argument requires us to interpret the divorce decree. We interpret a divorce decree like any other judgment. *Reiss v. Reiss*, 118 S.W.3d 439, 441 (Tex. 2003). We construe the decree as a whole to harmonize and give effect to the entire decree. *Shanks v. Treadway*, 110 S.W.3d 444, 447 (Tex. 2003).

■ It is true that, in its decree, the trial court awarded John "All household furniture, furnishings, fixtures, *goods*, art objects, collectibles, and appliances in the possession of the husband or subject to his sole control." (Emphasis added). However, the divorce decree similarly awarded household goods to Kay, but it stated separately that Kay would also be awarded "any other livestock" in her possession. The fact that the decree used different terms to separately refer to "household ... goods" and "livestock" suggests that the trial court did not intend to award John the horses as part of its award of household goods. *See id.*; *see also Treadway v. Shanks*, 110 S.W.3d 1, 7 (Tex. App.–Dallas 2000), *aff'd*, 110 S.W.3d 444 (Tex. 2003) (ascribing significance to a divorce decree's use of the term "pension plan" as a separate concept from "benefits" received under the plan). John points to no other aspect of the divorce decree which could be construed as a division of the value of the horses. We therefore agree with Kay that the trial court excluded these six horses from its division.

■ John introduced evidence that the combined value of these horses was $9,000. By comparison, Kay introduced evidence that their value was $27,000. This Court is not a finder of fact. *See Brownsville Pediatric Ass'n v. Reyes*, 68 S.W.3d 184, 188 (Tex. App.–Corpus Christi 2002, no pet.). Rather, it is for the trial court to determine, based on the available evidence, what the correct value of these horses should be. We sustain this aspect of Kay's third issue.

## VI. PRE-JUDGMENT INTEREST

■ By her fourth issue, Kay asserts that the trial court erred in declining to award prejudgment interest and abused its discretion in denying her motion for leave to amend her pleadings to include a claim for pre-judgment interest. To review the chronology of events, Kay filed her original petition for divorce in September 2010, and the trial took place in early April 2013.

The trial court circulated its draft decree in April 2014 and entered its original decree of divorce in July 2014. Kay first attempted to amend her pleadings to include a claim for pre-judgment interest in September 2014. The trial court entered a modified final decree in May 2015, but did not include pre-judgment interest. Kay filed this appeal in August 2015, and we remanded the matter for the entry of findings and conclusions. In December 2015, the trial court entered its findings and conclusions, which included the conclusion that "Kay Banker should have and recover from John Banker pre-judgment interest on the $626,733 awarded in the divorce decree .... To the extent this interest is not included in the judgment, the judgment should be modified."

▮▮▮ However, Kay does not argue on appeal that the trial court did in fact modify its judgment on remand. A "request for findings of fact and conclusions of law does not seek a substantive change in the judgment." *In re Gillespie*, 124 S.W.3d 699, 703 (Tex. App.–Houston [14th Dist.] 2003, orig. proceeding) (en banc). Findings of fact and conclusions of law, if made by the trial court, do not vacate or change the judgment, they merely explain the reasons for the judgment. *Id.*

Instead, Kay cites this conclusion as an endorsement of her position that this portion of the judgment should be reversed as erroneous. Kay advances two arguments in support of her position. First, she contends that it is not clear from the case law whether, as a petitioner in a divorce action, she was required to plead for pre-judgment interest at all. If she was not required to specially plead for pre-judgment interest, she reasons, then the trial court abused its discretion in failing to grant pre-judgment interest regardless of the state of her pleadings.

▮▮▮ We disagree. As a general rule, parties are required to plead for pre-judgment interest sought at common law as an element of damages, whereas statutory or contractual interest may be predicated on a prayer for general relief. *Benavidez v. Isles Const. Co.*, 726 S.W.2d 23, 25 (Tex. 1987); *see Bufkin v. Bufkin*, 259 S.W.3d 343, 358 (Tex. App.–Dallas 2008, pet. denied). As in *Bufkin*, Kay sought common law prejudgment interest as part of her divorce action. *See* 259 S.W.3d at 358. She was required to plead for such relief, but did not do so until after the original decree of divorce had been entered. *See id.*

▮▮▮ We next consider Kay's second argument, in which she contends that the trial court abused its discretion in denying her motion for leave to amend her pleadings. Kay cites the rule that a trial court has no discretion to refuse a party's request for leave to amend its pleadings post-verdict unless: (1) the opposing party presents evidence of surprise or prejudice; or (2) the amendment asserts a new cause of action or defense, and thus is prejudicial on its face, and the opposing party objects to the amendment. *Greenhalgh v. Serv. Lloyds Ins. Co.*, 787 S.W.2d 938, 939 (Tex. 1990); *Day Cruises Mar., L.L.C. v. Christus Spohn Health Sys.*, 267 S.W.3d 42, 55 (Tex. App.–Corpus Christi 2008, pet. denied); *see* Tex. R. Civ. P. 63, 66. Because the recovery of pre-judgment interest requires no evidentiary proof at trial, a post-verdict amendment to plead pre-judgment interest cannot cause surprise or prejudice to the opposing party. *See Benavidez*, 726 S.W.2d at 26.

However, this Court has consistently distinguished amendments filed after the *verdict* from amendments which are filed after *judgment* has been rendered: "after judgment is rendered, it is too late to amend, whether by a trial amendment or

an amendment complete in itself." *Cantu v. Martin*, 934 S.W.2d 859, 860 (Tex. App.–Corpus Christi 1996, no writ) (quoting *Boarder to Boarder Trucking, Inc. v. Mondi, Inc.*, 831 S.W.2d 495, 499 (Tex. App.–Corpus Christi 1992, no writ)); *see also In re L.A.*, No. 13–05–367–CV, 2006 WL 1280894, at *2 (Tex. App.–Corpus Christi May 11, 2006, no pet.) (mem. op.). "There should be a time in the trial of the cause when amendments to the pleadings should end, and it seems to us that time is after judgment has been rendered in a cause." *Boarder to Boarder*, 831 S.W.2d at 499.

Here, Kay first attempted to amend her pleadings two months after final judgment was rendered—which was, in turn, fifteen months after trial and over four years after Kay filed her petition. We hold that the trial court did not abuse its discretion in declining to grant Kay's untimely motion to amend her petition. *See Cantu*, 934 S.W.2d at 860. We overrule Kay's fourth issue.

## VII. CONCLUSION

We reverse the judgment of the trial court to the extent that it excludes the six horses which were in John's possession at the time of the divorce decree, and we remand for entry of judgment which justly divides this property based on the existing evidence. We suggest a remittitur of $4,941 regarding the two bank accounts at issue in this appeal. Pending acceptance of remittitur, we conditionally affirm that part of the judgment which deals with the valuation of the two bank accounts. We affirm the judgment of the trial court in all other respects.

## SUPPLEMENTAL OPINION

On March 2, 2017, this Court issued an opinion concerning the division of property in the divorce of John Banker and Kay Banker. We found that the record evidence did not support the trial court's valuation of two bank accounts awarded to Kay Banker, and we suggested a remittitur of $4,914 in favor of Kay to bring the division in line with the evidence. We affirmed this aspect of the judgment on condition of remittitur. John Banker has since filed with this Court a certificate verifying his voluntary remittitur in the amount of $4,914. *See* TEX. R. APP. P. 46.5. Because John's voluntary remittitur was timely filed and cures the error, we accept the remittitur. *See id.* 46.3, 46.5.

Separately, Kay filed a motion for rehearing concerning matters other than the remittitur. We deny the motion for rehearing.

Accordingly, we vacate our judgment, but not our opinion, of March 2, 2017; we reverse the judgment of the trial court to the extent that it excludes the six horses which were in John's possession at the time of the divorce decree, and we remand for entry of judgment which justly divides this property based on the existing evidence; and we affirm the judgment of the trial court in all other respects. *See* TEX. R. APP. P. 43.2. This Court's opinion of March 2, 2017 otherwise remains in effect.